# United States Court of Appeals
## For the First Circuit

No. 12-1053

CARLOS HERNANDEZ-CUEVAS,

Plaintiff, Appellee,

v.

WILLIAM TAYLOR and STEVEN M. MARTZ,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Thompson, Stahl, and Lipez,
Circuit Judges.

Stuart F. Delery, Assistant Attorney General, with whom Rosa E. Rodriguez-Velez, United States Attorney, Barbara L. Herwig, and Lowell V. Sturgill, Jr. were on brief, for appellants.
Jose F. Quetglas Jordan, with whom Pedro R. Vazquez and the Quetglas Law Offices were on brief, for appellee.

July 17, 2013

**LIPEZ, Circuit Judge.** This case requires us to decide for the first time whether an individual who alleges that the unlawful conduct of law enforcement officers caused him to be held for three months in pretrial detention without probable cause states a Fourth Amendment claim actionable through a Bivens suit.[1] Often called a "Fourth Amendment malicious prosecution" claim, the existence and contours of such a claim are the subject of considerable discord among the Courts of Appeals. After reviewing the relevant case law, we conclude that an individual's Fourth Amendment right to be free from seizure but upon probable cause continues through the pretrial period,[2] and that, in certain circumstances, injured parties can vindicate that right through a § 1983 or Bivens action. Furthermore, because we agree with the district court that Hernandez-Cuevas has pleaded facts which, if

_____

[1] A Bivens action is a civil action brought against agents of the United States, deriving its name from Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). "This implied cause of action is the federal analog to § 1983 suits against state officials." Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011).

[2] The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

-2-

true, would be sufficient to establish that Taylor and Martz violated his Fourth Amendment rights, we affirm the denial of qualified immunity and remand for further proceedings.

**I.**

**A. Factual Background**

The following facts are drawn from the complaint and documents incorporated into the complaint.

In 2004, plaintiff Carlos Hernandez-Cuevas was 40 years old and living in a rented room in a multi-unit building located at 1655 Santa Ana Street in Carolina, Puerto Rico. Hernandez-Cuevas is dark-skinned, approximately 5'10" tall, and thin, weighing about 150 pounds.

That same year, a joint federal-Commonwealth task force consisting of FBI agents and local police officers opened a special investigation targeting a significant drug and money laundering conspiracy operating in Carolina. The task force employed at least two confidential informants, referred to in the complaint as "UI-1" and "UI-2." Working undercover, UI-1 and UI-2 arranged a meeting on July 20, 2004 with several members of the money laundering conspiracy in the parking lot of the Pueblo Supermarket on Route 187 in Carolina, "where a courier acting under the direction of such co-conspirators was to deliver proceeds of drug sales to UI-1."

The task force agents set up a surveillance unit to

observe this transaction. According to a contemporaneous surveillance report, the agents at the scene saw a white and silver Mitsubishi Montero with license plate number DMV-656 enter the parking lot and park next to UI-1's car. The driver of the Montero, referred to in the complaint as "UNSUB #1," rolled down his window and spoke with UI-1. Both cars then left the parking lot.

Some time later, UI-1 returned to the parking lot, this time tailed by a white Jeep Cherokee with license plate number FDA-680. Two unknown males were inside the Jeep: the driver, referred to in the complaint as "UNSUB #2," and a passenger, referred to as "UNSUB #3." In their surveillance report, the FBI officers at the scene described UNSUB #3 as a "black male, with black hair, 5 feet and 7 inches tall, a heavy build, and in his late fifties."

The Jeep pulled up alongside UI-1's car. UNSUB #3 exited the Jeep and placed two bags containing $321,956 in cash in the trunk of UI-1's car. UNSUB #3 then returned to the Jeep, which left the parking lot. FBI agents from the surveillance unit followed the Jeep, and saw the driver drop UNSUB #3 off on Santa Ana Street in Carolina. The agents last observed UNSUB #3 walking toward the "porch area" of the multi-unit building located at 1655 Santa Ana Street, where Hernandez-Cuevas lived.

Nearly a year passed, during which the FBI was unable to positively identify UNSUB #3. "In a rush to indict someone as

UNSUB #3," Martz, Taylor, and UI-1 conspired to manufacture evidence indicating that UNSUB #3 was Hernandez-Cuevas. In furtherance of their plan, Martz and UI-1 "carried out a tainted photo identification." On May 25, 2005, Martz e-mailed UI-1 pictures of six individuals, including a photograph of Hernandez-Cuevas. The following day, U-1 called Martz on the telephone and identified Hernandez-Cuevas as UNSUB #3, even though Hernandez-Cuevas's physical appearance -- tall, thin, and 40 years old -- is strikingly different from the contemporaneous FBI report describing UNSUB # 3 as "5 feet and 7 inches tall, a heavy build, and in his late fifties." Despite the discrepancies between Hernandez-Cuevas's appearance and the original surveillance description of UNSUB #3, Martz wrote an internal FBI report based on UI-1's identification concluding that UNSUB #3 was in fact Hernandez-Cuevas.

Another two years passed without further action in the case. Finally, on November 21, 2007, Taylor "either knowingly or in reckless disregard of the truth" included the false identification of Hernandez-Cuevas as UNSUB #3 in a warrant affidavit, attesting that on July 20, 2004, Hernandez-Cuevas had delivered $321,956 in drug proceeds to UI-1.

On the basis of these false statements, a magistrate judge in Puerto Rico issued a warrant for Hernandez-Cuevas's arrest. According to the complaint, without Taylor's statements,

-5-

the government would have been unable to establish probable cause to obtain the warrant. FBI agents arrested Hernandez-Cuevas on December 3, 2007 and brought him before a magistrate judge the following day. On December 6, 2007, he appeared again before a magistrate judge, who ordered him detained without bail pending trial and transferred him to a federal prison in New Jersey, where he was incarcerated for nearly three months awaiting further proceedings. On February 29, 2008, he was released on his own recognizance following a hearing before a magistrate judge in New Jersey; on April 18, 2008, the United States Attorney for the District of New Jersey dismissed the charges against Hernandez-Cuevas.

Hernandez-Cuevas alleges that he was not in the parking lot of the Pueblo Supermarket on July 20, 2004, and that he has never been involved in the drug trade. He also alleges that he has never "owned, possessed, driven or traveled" in either of the cars observed by the FBI agents in the parking lot.

## B. Procedural Background

Hernandez-Cuevas filed his complaint on March 2, 2009, alleging that Martz and Taylor's misconduct caused him to be held in federal custody for three months without probable cause.[3] The

---

[3] The original complaint was dismissed without prejudice for lack of proper service on July 14, 2009 and re-filed on July 28, 2009. The district court determined that under Puerto Rico law, the original complaint tolled the statute of limitations. See P.R. Laws Ann. tit. 31, § 5303; see also López-González v. Municipality

defendants first moved to dismiss plaintiff's complaint on statute of limitations grounds, arguing that Puerto Rico's one-year limitations period had run by the time Hernandez-Cuevas filed his complaint on March 2, 2009. Under the government's theory, any Fourth Amendment claim of Hernandez-Cuevas had accrued in December 2007 on the day of his allegedly unlawful arrest. As such, the Puerto Rico one-year statue of limitations expired in December 2008, several months before Hernandez-Cuevas filed this complaint.

The district court agreed in part with the defendants, reasoning that if Hernandez-Cuevas had filed his complaint shortly after his arrest in December 2007, he would have had a straightforward Fourth Amendment false arrest claim. But because Hernandez-Cuevas failed to file his complaint until more than a year after his December 2007 arrest, the district court agreed with the government that any claim for damages flowing from the arrest itself was time-barred. See Torres v. Superintendent of Police, 893 F.2d 404, 406 (1st Cir. 1990) (noting that "the appropriate statute of limitations for a Section 1983 claim is Puerto Rico's one-year period governing tort actions"); see also Wallace v. Kato, 549 U.S. 384, 390 (2007) (holding that accrual for § 1983 claims is governed by federal law and a Fourth Amendment false arrest claim accrues on the date of arrest); Heck v. Humphrey, 512 U.S. 477, 484

of Comerío, 404 F.3d 548, 551-52 (1st Cir. 2005). Defendants do not challenge that determination on appeal. Accordingly, we treat this complaint as though it had been filed on March 2, 2009.

-7-

(1994); <u>Calero-Cólon</u> v. <u>Betancourt-Lebron</u>, 68 F.3d 1, 3-4 (1st Cir. 1995) (discussing accrual rules for malicious prosecution and false arrest claims brought under § 1983).

The court disagreed, however, with the government's argument that the statute of limitations on all plausible Fourth Amendment claims had run by the time Hernández-Cuevas filed his complaint. Instead, the court agreed with Hernandez-Cuevas that in addition to allegations that he sustained injuries from the arrest itself, the complaint alleged that he sustained injuries from the three months that he was held in federal custody without probable cause. Concluding that Hernandez-Cuevas was correct that the closest common law analogy for this claim was malicious prosecution, the court allowed him to proceed on this claim because malicious prosecution claims accrued at common law on the day that the proceedings terminated in plaintiff's favor, <u>see</u> <u>Wallace</u>, 549 U.S. at 390, which in this case occurred on April 18, 2008, less than a year before Hernandez-Cuevas filed his complaint on March 2, 2009.[4]

The defendants then filed a second motion to dismiss,

_____

[4] A defendant cannot file an interlocutory appeal of a denial of a motion to dismiss on statute of limitations grounds. Instead, a defendant must wait until final judgment has entered to seek appellate review. <u>See</u> <u>Garnier</u> v. <u>Rodríguez</u>, 506 F.3d 22, 25 (1st Cir. 2007) (holding that where officer filed interlocutory appeal of both denial of qualified immunity and denial of motion to dismiss on statute of limitations grounds, court of appeals had jurisdiction only over qualified immunity appeal).

arguing, inter alia, that Taylor and Martz were entitled to qualified immunity. The court denied the defendants' motion. Citing the Supreme Court's opinion in Franks v. Delaware, 438 U.S. 154 (1978), the court concluded that it had long been clearly established law that the Fourth Amendment prohibits a police officer from manufacturing probable cause by knowingly including false statements in a warrant affidavit.[5]

Taylor and Martz then filed this interlocutory appeal challenging the district court's denial of qualified immunity.

## II.

We have jurisdiction over this interlocutory appeal because a trial court's denial of a federal officer's qualified immunity defense is a "final decision within the meaning of 28 U.S.C. § 1291." Soto-Torres v. Fraticelli, 654 F.3d 153, 157 (1st Cir. 2011); see also Ashcroft v. Iqbal, 556 U.S. 662, 671-72 (2009); Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004) ("[M]any of the benefits of qualified immunity are squandered if the action is incorrectly allowed to proceed to trial."). Our review is de novo.

---

[5] In his opposition brief, Hernandez-Cuevas argues that Martz and Taylor have waived their qualified immunity defense because they did not argue before the district court that they were entitled to qualified immunity on the Fourth Amendment malicious prosecution claim specifically. There is no merit to this argument. Martz and Taylor asserted the affirmative defense of qualified immunity in their Answer to Hernandez-Cuevas's complaint and filed a motion to dismiss arguing that they were entitled to qualified immunity on Hernandez-Cuevas's claim that they "conspired to maliciously prosecute" him. Martz and Taylor needed to do nothing more to preserve their qualified immunity defense.

See <u>Ocasio-Hernández</u> v. <u>Fortuño-Burset</u>, 640 F.3d 1, 7 (1st Cir. 2011).

In an appeal from a denial of qualified immunity, we generally proceed through a two-part analysis,[6] considering whether "(1) the facts alleged show the defendants' conduct violated a constitutional right, and (2) the contours of this right are 'clearly established' under then-existing law so that a reasonable officer would have known that his conduct was unlawful." <u>Santana</u> v. <u>Calderón</u>, 342 F.3d 18, 23 (1st Cir. 2003). In this case, however, Taylor and Martz have declined to raise any argument about the 'clearly established' prong, choosing instead to pursue their argument that Hernandez-Cuevas has failed to state a plausible Fourth Amendment claim.[7] As such, we confine ourselves to

---

[6] Because "[t]he qualified immunity test is identical for claims pursued under § 1983 and for <u>Bivens</u>-type suits," <u>Martínez-Rodríquez</u> v. <u>Guevara</u>, 597 F.3d 414, 419 (1st Cir. 2010), we use case law developed under both types of claims interchangeably.

[7] We note that the government's decision to forfeit the clearly established prong may have been motivated by the reasonable conclusion that such an argument would be hopeless in any event. Though the question of whether the Fourth Amendment provides substantive protection during the pretrial period is a question of first impression in this circuit, it cannot be seriously argued that an objectively reasonable officer in Martz and Taylor's position would have been ignorant of the fact that fabricating evidence was constitutionally unacceptable. Indeed, we have previously concluded that it is "self-evident" that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." <u>Limone</u> v. <u>Condon</u>, 372 F.3d 39, 44-45 (1st Cir. 2004) (concluding that "the right not to be framed by law enforcement agents was clearly established in 1967").

-10-

consideration of the first prong of the analysis, namely, "whether the facts alleged, viewed in the light most favorable to the complaining party, show that the officer's conduct violated some constitutional right." Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).

That inquiry is more complicated than usual. Neither this circuit nor the Supreme Court has ever explicitly determined that the Fourth Amendment encompasses a malicious prosecution claim. See Wallace, 549 U.S. at 390 n.2 ("We have never explored the contours of a Fourth Amendment malicious-prosecution suit under § 1983 . . . ."); Harrington v. City of Nashua, 610 F.3d 24, 30 (1st Cir. 2010) ("It remains an unanswered question whether a malicious prosecution claim is cognizable under the Fourth Amendment and section 1983 . . . ."); Moreno-Medina v. Toledo, 458 Fed. App'x 4, 7 (1st Cir. 2012) (unpublished).

Given the unsettled nature of this question, we are frankly baffled by the government's explicit decision to forego any argument that the Fourth Amendment does not encompass a malicious prosecution claim. In its opening brief on appeal, the government mentions the unsettled nature of this question, but then, without presenting any argument, decides to proceed, assuming, arguendo, that the Fourth Amendment encompasses a malicious prosecution claim.

Despite this omission, it would be an odd exercise on our

part, under the circumstances of this case, to evaluate the sufficiency of the pleadings on the assumption that the underlying right existed. That approach might make sense if we found, as the government argues, that the pleadings are insufficient, and thereby brought this case to a close. That appears to be the government's calculation. However, if we assumed the right existed, found the pleadings sufficient, and remanded to the district court for further proceedings, and then determined at a later stage of the case that the underlying right did not exist, the post-remand proceedings would have been a waste of judicial resources. Thus, to avoid such an outcome, we will consider first whether the right Hernandez-Cuevas seeks to vindicate exists at all before we determine whether he has pled facts sufficient to establish that a constitutional violation occurred. <u>Cf.</u> <u>Engel</u> v. <u>Buchan</u>, 710 F.3d 698, 702 (7th Cir. 2013) ("The issue of qualified immunity necessarily includes the predicate of whether a <u>Bivens</u> remedy is available in this context at all.").

## A. Fourth Amendment Malicious Prosecution Claims

### 1. Legal Background

There has long been a sense among the courts that the Constitution provides some protection for individuals who are targeted for unreasonable, baseless prosecutions, and who, as a result, are detained without probable cause during the pretrial period. Though this view seems to be widely shared, the precise

constitutional source and extent of any protection against this type of harm are issues on which there has long existed "an embarrassing diversity of judicial opinion." Albright v. Oliver, 510 U.S. 266, 271 n.4 (1994) (citation omitted) (internal quotation marks omitted) (discussing the variety of judicial approaches to these claims).

In years past, many courts, including this one, recognized a substantive or procedural due process right to be free from malicious prosecution. See, e.g., Torres, 893 F.2d at 409. Locating the right to be free from unreasonable pretrial detention in the due process guarantees of the Constitution dovetailed with our understanding that the rights of an accused following arrest and arraignment are generally enshrined in the Fifth and Sixth Amendments.

Nearly two decades ago, however, the Supreme Court's opinion in Albright v. Oliver, 510 U.S. 266, firmly closed the door on substantive due process as a vehicle for bringing such claims. In addition, at least a plurality of the Justices concluded that procedural due process would likewise rarely, if ever, be an appropriate vehicle for such claims. See id. at 283-86 (Kennedy, J., concurring in the judgment) (concluding that any procedural due process malicious prosecution claim would, in most cases, be precluded by the Parratt-Hudson doctrine). At the same time, however, the Court strongly suggested in dicta that the plaintiff

-13-

in <u>Albright</u> would have been more successful if he had sought relief under the Fourth Amendment. <u>See</u> <u>id.</u> at 274 ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

Though confined to dicta, these statements about a Fourth Amendment right to be free from malicious prosecution resulted in a sea change in the law. Prior to <u>Albright</u> only a minority of jurisdictions recognized a Fourth Amendment malicious prosecution claim, but it is now the majority rule. Indeed, each of the eight Courts of Appeals to directly address in the years since <u>Albright</u> whether the Fourth Amendment provides protection against pretrial detention without probable cause has concluded that it does. <u>See</u>, <u>e.g.</u>, <u>Manganiello</u> v. <u>City of New York</u>, 612 F.3d 149, 160-61 (2d Cir. 2010); <u>McKenna</u> v. <u>City of Philadelphia</u>, 582 F.3d 447, 461 (3d Cir. 2009); <u>Evans</u> v. <u>Chalmers</u>, 703 F.3d 636, 647 (4th Cir. 2012); <u>Castellano</u> v. <u>Fragozo</u>, 352 F.3d 939 (5th Cir. 2003) (en banc); <u>Sykes</u> v. <u>Anderson</u>, 625 F.3d 294, 310 (6th Cir. 2010); <u>Lassiter</u> v. <u>City of Bremerton</u>, 556 F.3d 1049 (9th Cir. 2009); <u>Pierce</u> v. <u>Gilchrist</u>, 359 F.3d 1279 (10th Cir. 2004); <u>Grider</u> v. <u>City of Auburn</u>, 618 F.3d 1240, 1256 (11th Cir. 2010).

Though there is now broad consensus among the circuits that the Fourth Amendment right to be free from seizure but upon probable cause extends through the pretrial period, the circuits are divided over the elements of such a claim. <u>See</u> <u>Pierce</u>, 359

F.3d at 1287-90 & n.8 (discussing circuit split); <u>Castellano</u>, 352 F.3d at 949-53 (same).  The varying approaches adopted by the different Courts of Appeals can be roughly placed in one of two groups.  The Fourth, Fifth, Sixth, and Tenth Circuits have adopted a purely constitutional approach, requiring the plaintiff to demonstrate only a Fourth Amendment violation.  The Second, Third, Ninth, and Eleventh Circuits, on the other hand, have adopted a blended constitutional/common law approach, requiring the plaintiff to demonstrate a Fourth Amendment violation <u>and</u> all the elements of a common law malicious prosecution claim.

Though these two approaches reflect a theoretical divide between the circuits, the elements of a Fourth Amendment malicious prosecution claim under either the blended approach or the purely constitutional approach are largely identical with one caveat.  The plaintiff in a common law malicious prosecution claim must, as the name implies, demonstrate that the defendant officer acted with subjective malice.[8]  A plaintiff alleging a purely constitutional Fourth Amendment claim, on the other hand, usually need establish only that his seizure was objectively unreasonable.  <u>See</u> <u>Sykes</u>, 625

_____

[8] The elements of a common law malicious prosecution claim vary slightly from state to state, but in general they are:  "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff; (2) the termination of the proceeding in favor of the accused; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice."  <u>Calero-Colón</u> v. <u>Betancourt-Lebron</u>, 68 F.3d 1, at 3 n.5 (1st Cir. 1995); <u>see</u> <u>also</u> W. Keeton, et al., <u>Prosser & Keeton on Law of Torts</u> § 119, at 871 (5th ed. 1984).

F.3d at 310-11 ("[T]he reasonableness of a seizure under the Fourth Amendment should be analyzed from an objective perspective, which, even in the context of malicious-prosecution claims, renders irrelevant the subjective state of mind of the defendant[.]" (internal quotation marks omitted)). However, as we shall explain, there may be less to this divide than first appears.

## 2. Our Approach

Today, we join our sister circuits in concluding that the Fourth Amendment protection against seizure but upon probable cause does not end when an arrestee becomes held pursuant to legal process.[9] Though the Fifth and Sixth Amendments generally control events following the arrest and arraignment of an individual accused of committing a crime, we are convinced that an individual does not lose his Fourth Amendment right to be free from unreasonable seizure when he becomes detained pursuant to judicial process. Certainly, in most cases, the neutral magistrate's

---

[9] The moment a defendant becomes held pursuant to legal process differs depending on whether or not the defendant was arrested pursuant to a warrant. In a case where an individual is arrested without a warrant, he is detained without process until, "for example, he is bound over by a magistrate or arraigned on charges." Wallace v. Kato, 549 U.S. 384, 389 (2007). In most cases, this post-arrest, pre-process period can last only up to 48 hours. See Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). Where an individual is arrested pursuant to a judicial warrant, however, he becomes held pursuant to legal process at the moment of arrest. See Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2001) (noting that in a malicious prosecution action, "[g]enerally, the offending legal process comes either in the form of an arrest warrant . . . or a subsequent charging document"); see also W. Keeton, et al., supra, § 119, at 888.

-16-

determination that probable cause exists for the individual's arrest is an intervening act that could disrupt any argument that the defendant officer had caused the continued unlawful seizure. See Sanchez v. Pereira-Castillo, 590 F.3d 31, 50 (1st Cir. 2009) ("We employ common law tort principles when conducting 'inquiries into causation under § 1983.'" (quoting Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989))). But, if a plaintiff can overcome this causation problem and demonstrate that law enforcement officers were responsible for his continued, unreasonable pretrial detention, the plaintiff has stated a constitutional injury that may be vindicated through a § 1983 action. See Evans, 703 F.3d at 647 ("[E]ven where . . . a prosecutor retains all discretion to seek an indictment, police officers may have caused the seizure and remain liable to a wrongfully indicted defendant[.]"). For example, officers may be liable for unlawful pretrial detention when they have (1) "lied to or misled the prosecutors"; (2) "failed to disclose exculpatory evidence"; or (3) "unduly pressured the prosecutor to seek the indictment." Id. at 647-48; see also Sykes, 625 F.3d at 308-309 (requiring plaintiff to demonstrate that the defendant officer "made, influenced, or participated in the decision to prosecute" (quoting Fox v. Desoto, 489 F.3d 227, 237 (6th Cir. 2007)) (internal quotation marks and alterations omitted)).

This holding harmonizes our law with the law of other

-17-

circuits, and makes explicit what has long been implicit in our case law. In the past we have held that "some truths are self-evident. . . . [I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." Limone, 372 F.3d at 44-45. We now further specify that one constitutional source of this "self-evident" prohibition against manufactured evidence in the pretrial detention context is the Fourth Amendment's guarantee of freedom from seizure but upon probable cause.

As to the elements of such a claim, we join those four circuits that have adopted a purely constitutional approach,[10] holding that a plaintiff may bring a suit under § 1983 (or Bivens) if he can establish that: "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable

---

[10] We acknowledge that our statements in dicta have been inconsistent, with some cases suggesting we might support a constitutional approach and others indicating a common law approach. Indeed, our comments have been so difficult to reconcile that other courts and commentators have placed us on both sides of the split. Compare Castellano v. Fragozo, 352 F.3d 939, 949 (5th Cir. 2003) (en banc) (discussing circuit split and concluding that the First Circuit requires showing of all common law elements) and Jacques L. Schillachi, Note, Unexamined Premises: Toward Doctrinal Purity in § 1983 Malicious Prosecution Doctrine, 97 Nw. U. L. Rev. 439, 460-61 (2002) (same), with Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000) (placing First Circuit among the circuits requiring something less than a showing of all common law tort elements), and Joseph G. Yannetti, Note, Who's on First, What's on Second, and I Don't Know About the Sixth Circuit: A § 1983 Malicious Prosecution Circuit Split that Would Confuse Even Abbott & Costello, 36 Suffolk U. L. Rev. 513, 517 (2003) (same).

cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans, 703 F.3d at 647. The rights guaranteed by the Fourth Amendment are not superseded by the common law, and we see no principled reason why plaintiffs alleging a constitutional injury should be entitled to relief only if they can demonstrate that their claim meets all the elements of a common law claim. Though we often look to the common law for guidance, it is a familiar principle that the constitutional tort authorized by § 1983 "stands on its own, influenced by the substance, but not tied to the formal categories and procedures, of the common law." Albright, 510 U.S. at 277 n.1 (Ginsburg, J., concurring); see also Castellano, 352 F.3d at 954-55 (discussing how continued uncritical reliance on pre-Albright case law has led to an impermissible blending of state tort law and constitutional law).

Though we adopt a purely constitutional rather than a blended constitutional/common law approach, we believe that the practical consequences of this choice are less significant than they initially appear. In fact, in most cases, the showing required to prove a Fourth Amendment malicious prosecution claim under a purely constitutional theory will be almost indistinguishable from that required in the circuits using a blended constitutional/common law approach to a Fourth Amendment malicious prosecution claim. Regardless of the approach adopted, to establish a Fourth Amendment violation involving pretrial

detention under the Supreme Court's reasoning in <u>Franks</u> v. <u>Delaware</u>, the plaintiff must demonstrate that -- despite the magistrate's determination that the evidence presented was, on its face, sufficient to establish probable cause -- that evidence was, in fact, constitutionally unacceptable because the officers formulated evidence essential to the probable cause determination with a mental state similar to common law malice.

The Supreme Court explained in <u>Franks</u> that to show that a magistrate's facially valid probable cause determination was constitutionally unacceptable, the moving party must demonstrate that the police officer submitted to the magistrate evidence that was not "believed or appropriately accepted by the [officer] as true." <u>Franks</u>, 438 U.S. at 165. This was a constitutional requirement, flowing from the "language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise." <u>Id.</u> at 164. The Court thus concluded that in order for a warrant to satisfy the Fourth Amendment, the magistrate's probable cause determination must not have relied upon evidence an officer submitted in bad faith. <u>Id.</u> at 171-72; <u>see</u> <u>Burke</u> v. <u>Town of Walpole</u>, 405 F.3d 66, 82 (1st Cir. 2005) (reasoning that where "reckless misstatements or omissions" were included in a warrant affidavit "a court owes no deference to a magistrate's decision to issue an arrest warrant"); <u>see</u> <u>also</u> <u>United States</u> v. <u>Ranney</u>, 298 F.3d 74, 78 (1st Cir. 2002) (noting that defendants "failed to make

the requisite . . . showing that absent the false information the affidavit contained insufficient evidence to support a finding of probable cause").

Franks, however, did not establish strict liability for police officers. To show that the evidence presented to the magistrate was not "truthful" in the Franks sense, "[a]llegations of [police] negligence or innocent mistake are insufficient." Franks, 438 U.S. at 171. Rather, the plaintiff must demonstrate that law enforcement officers made statements in the warrant affidavit which amounted to "deliberate falsehood or . . . reckless disregard for the truth," and that those deliberate falsehoods were necessary to the magistrate's probable cause determination. Id.; see also Burke, 405 F.3d at 81-82 (applying the Franks standard in the § 1983 context). This kind of reprehensible behavior seems indistinguishable from the common law element of malice.[11] Indeed, we suspect that in those jurisdictions requiring an independent showing of malice, the malice analysis is largely duplicative of the probable cause analysis, which excludes from that analysis any statements in the warrant affidavit deliberately false or in reckless disregard of the truth. See, e.g., Grider, 618 F.3d at 1258-59 (relying on the same allegations concerning a police

---

[11]   Common law malice standards vary by jurisdiction and context, but Black's Law Dictionary defines malice to mean "1. the intent, without justification or excuse, to commit a wrongful act. 2. Reckless disregard of the law or of a person's legal rights." Black's Law Dictionary 712 (8th ed. 2004).

officer fabricating evidence to infer both that the individual was arrested without probable cause and that the police officer acted with malice).

Having determined that the Fourth Amendment right to be free from seizure but upon probable cause extends through the pretrial period and a plaintiff may bring a suit under § 1983 (or Bivens) to vindicate that right, we turn now to the complaint at issue in this appeal and consider whether the facts alleged therein state a plausible claim that Martz and Taylor violated this right.

## B.  Hernandez-Cuevas's Complaint

In evaluating the sufficiency of the complaint, our inquiry focuses "on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Ocasio-Hernández, 640 F.3d at 13; see also Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  To this end, "we first disregard all conclusory allegations that merely parrot the relevant legal standard." Young v. Wells Fargo, N.A., No. 12-1405, slip op. at 10 (1st Cir. May 21, 2013).  We then consider whether the remaining allegations "taken as true, . . . state a plausible, not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010).  Ultimately, "[t]he

relevant question . . . in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible.'" Rodríguez-Reyes v. Molina-Rodríquez, 711 F.3d 49, 55 (1st Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569 n.14 (2007)).

Here, despite our admonition that "[t]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible," Ocasio-Hernández, 640 F.3d at 14 (quoting Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009)), the government has done just that, electing in its appeal to challenge the complaint in a piecemeal fashion. The government dwells in particular on five allegations in the complaint, each of which it claims amounts to nothing more than the sort of "formulaic recitation" that Iqbal requires us to disregard. These allegations are that: 1) Martz conducted a "tainted" photo array; 2) Martz included the identification obtained from the photo array in an internal FBI report; 3) Taylor recklessly or knowingly included that same identification in a warrant affidavit; 4) Martz's report and photo identification caused Hernandez-Cuevas to be arrested and charged; and 5) Taylor and Martz framed Hernandez-Cuevas because they were "in a rush to indict someone" for the role UNSUB #3 played in the Carolina conspiracy.

-23-

We are unpersuaded by the government's balkanized approach. Rather, reviewing the complaint as a whole, we believe that it was reasonable for the district court to infer from the cumulative power of the facts alleged in the complaint that Martz and Taylor caused Heranandez-Cuevas to be detained without probable cause for three months following his initial appearance before the magistrate. Cf. Ocasio-Hernández, 640 F.3d at 15 ("[T]he Supreme Court has suggested that allegations that would individually lack the heft to make a claim plausible may suffice to state a claim in the context of the complaint's other factual allegations." (citing Twombly, 550 U.S. at 557)). Specifically, we find that Hernandez-Cuevas's complaint describes the following narrative.

## 1. July 2004 Surveillance

In July 2004, an FBI task force surveillance unit witnessed a black male, short, stocky, and in his late fifties, transfer $321,956 in drug proceeds to an undercover informant. The agents tailed this man to Santa Ana Street in Carolina, but eventually lost him. They last saw him walking toward the multi-unit building located at 1655 Santa Ana Street.

## 2. The Investigation

Although the investigation into the broader money laundering conspiracy continued, more than a year passed and the FBI was still unable to locate or identify the man who had delivered the $321,956 to UI-1 in the Carolina parking lot. Under

-24-

pressure from their superiors to identify the subject before more time was lost, agents Martz and Taylor discovered that there was indeed a black male living at 1655 Santa Ana Street. His name was Carlos Hernandez-Cuevas.

Other than his race and his address, nothing connected this younger man to the money laundering conspiracy. Hernandez-Cuevas did not match the physical description of the older man observed in the Pueblo Supermarket parking lot, and he was not associated with either the Jeep Cherokee or the Mitsubishi Montero the surveillance unit identified at the scene.

### 3. The Photo Array

Realizing that this meager evidence would be woefully insufficient to establish probable cause, Martz and Taylor decided to create false evidence linking Hernandez-Cuevas to the crime. To accomplish their unlawful means, Taylor and Martz worked in concert with confidential informant UI-1 to arrange a tainted photo array. Although the complaint does not specify how the co-conspirators tainted the photo array, Hernandez-Cuevas has pled sufficient facts to support a reasonable inference that something was amiss. Specifically, Hernandez-Cuevas has alleged that rather than selecting a photograph of someone matching the description of UNSUB #3 -- short, stocky, and nearly sixty -- UI-1 picked a photograph of Hernandez-Cuevas, who was tall, thin, and only forty.

The government is correct that a mistaken identification

-25-

is not necessarily inconsistent with innocent behavior. Here, however, the facts alleged concerning the striking physical dissimilarity between the surveillance description of UNSUB #3 and Hernandez-Cuevas make the inference that the photo array was somehow dishonest more plausible than the inference of an innocent, but mistaken, identification. That is, Hernandez-Cuevas's allegations are more than merely "consistent with conspiracy, but just as much in line with" innocent behavior. Twombly, 550 U.S. at 554. Taken together, they raise a "reasonable expectation" that further proceedings will reveal evidence of illegal conduct. Id. at 556.

Like the district court, we are unconvinced by the government's argument that Hernandez-Cuevas's allegation that the photo array was "tainted" is "threadbare" in the sense of Iqbal. Certainly, an allegation that a photo array has been "tainted" can be a legal conclusion in a case where a plaintiff alleges that the likelihood of misidentification was so high that use of the identification at trial would amount to a due process violation. See Foster v. California, 394 U.S. 440, 442-43 & n.2 (1969) (noting that "in some cases the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible as a matter of law"). But we do not understand Hernandez-Cuevas's allegation that his photo array was "tainted" in this technical sense. Rather, his allegation is a

descriptive, factual statement identifying the means Martz, Taylor, and UI-1 employed to frame him.

### 4.  The Warrant Affidavit

Taylor then either knowingly or with reckless disregard for the truth made sworn statements in a warrant affidavit identifying Hernandez-Cuevas as the man who delivered the tainted cash to UI-1 in the Pueblo Supermarket parking lot.  It is a plausible inference that Taylor acted with the requisite mental state because the complaint alleges that Taylor made these statements despite the fact that he knew that Hernandez-Cuevas did not match the original description of UNSUB #3 in the surveillance report, that Hernandez-Cuevas was not associated with either the Jeep Cherokee or the Mitsubishi Montero identified by the surveillance unit as participating in the parking lot transaction, and that the only evidence linking Hernandez-Cuevas to the money-laundering conspiracy was the tainted photo identification, his race, and his address.   See Burke, 405 F.3d at 81 ("Reckless disregard for the truth in the submission of a warrant application may be established where an officer in fact entertained serious doubts as to the truth of the allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations in the application." (internal quotation marks and alteration omitted)).

## 5.  Arrest and Detention

The magistrate judge determined on the basis of Taylor's affidavit that probable cause existed and issued a warrant for Hernandez-Cuevas's arrest.  Under the Franks analysis, see discussion supra, we, like the district court, must reconsider the evidence that was before the magistrate, omitting those misstatements of Taylor that were intentionally or recklessly made, to determine if, without the false evidence, there was still probable cause to arrest Hernandez-Cuevas.  See Franks, 438 U.S. at 172 n.8 (noting that once the false evidence has been removed, "if what is left is sufficient to sustain probable cause, the inaccuracies are irrelevant").  We agree with the district court that, without Martz's statements based on the photo identification, the remaining facts linking Hernandez-Cuevas to the conspiracy -- that he was black and that he lived in an apartment complex close to where UNSUB #3 was last seen -- would be woefully insufficient to establish probable cause.

Nevertheless, on the basis of a warrant that would have never have issued without the tainted photo array, Hernandez-Cuevas was arrested and brought before a magistrate judge, who bound him over and ordered him detained in federal custody for three months until a second magistrate judge ordered his release.  Shortly thereafter, the prosecutor dismissed the charges against Heranndez-Cuevas, setting the stage for this claim of unlawful detention.

### 6. Conclusion

Given the specific facts Hernandez-Cuevas has included in his complaint -- about the July 20, 2004 transaction in Carolina, his own physical dissimilarity with UNSUB #3, the absence of any relationship to the cars at the scene, and the lack of other evidence tying him to the conspiracy -- we affirm the district court's conclusion that the plaintiff has stated a plausible claim that Martz and Taylor, through the use of a tainted photo array, caused Hernandez-Cuevas to be held in federal custody for three months without probable cause in violation of the Fourth Amendment's prohibition against unreasonable seizures.

## III.

For these reasons, the district court's denial of qualified immunity is <u>affirmed</u>.  We <u>remand</u> to the district court for further proceedings consistent with this opinion.

**<u>So ordered.</u>**