# United States Court of Appeals
## For the First Circuit

No. 16-1186

VLADEK FILLER,

Plaintiff, Appellee,

v.

MARY KELLETT,

Defendant, Appellant,

HANCOCK COUNTY; WILLIAM CLARK; WASHINGTON COUNTY; DONNIE SMITH;
TRAVIS WILLEY; DAVID DENBOW; MICHAEL CRABTREE; TOWN OF
GOULDSBORO, ME; TOWN OF ELLSWORTH, ME; JOHN DELEO; CHAD WILMOT;
PAUL CAVANAUGH; STEPHEN MCFARLAND; MICHAEL POVICH; CARLETTA
BASSANO; ESTATE OF GUY WYCOFF; LINDA GLEASON,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

John S. Whitman, with whom Heidi J. Hart and Richardson,
Whitman, Large & Badger were on brief, for appellant.
Thomas F. Hallett, with whom Timothy E. Zerillo and Hallett,
Zerillo, Whipple, P.A. were on brief, for appellee.
Jamesa J. Drake, with whom Zachary L. Heiden and Ezekiel
Edwards were on brief, for amici curiae American Civil Liberties
Union and American Civil Liberties Union of Maine Foundation; and

Rory A. McNamara and Drake Law, LLC, on brief for amicus curiae Maine Association of Criminal Defense Lawyers.

————————————

June 15, 2017

————————————

**BARRON**, **Circuit Judge**.  This appeal arises out of the state prosecution of Vladek Filler in 2009.  He was initially indicted on five counts of gross sexual assault and two counts of assault of his then-wife Ligia Arguetta Filler.  After two trials -- and two appeals to the Maine Law Court -- he was convicted only of one misdemeanor assault count, which he is still challenging.  In the wake of these events, Filler filed a civil action against a number of defendants under 42 U.S.C. § 1983, including a claim against the prosecuting attorney, then-Hancock County Assistant District Attorney Mary Kellett, for malicious prosecution.  Kellett chose to challenge the suit by a 12(b)(6) motion on the sprawling pleadings, rather than allowing for the development of any facts or providing a defense based on the undisputed facts on summary judgment.  Kellett now brings an interlocutory appeal from the District Court's order denying her absolute prosecutorial immunity from certain of Filler's claims against her.  We dismiss the appeal for lack of jurisdiction.

## I.

As only a narrow subset of the many issues involved in this case are raised in this appeal, we recount just the relevant facts, as set forth in Filler's 103-page Amended Complaint and the District Court's opinion.  Because this case comes to us as an interlocutory appeal, we assume "that the Plaintiff['s] allegations regarding the Defendant['s] authority, duties, acts

- 3 -

and omissions are true, and that they are sufficient to allege a violation of federal rights." Guzman-Rivera v. Rivera-Cruz, 55 F.3d 26, 28 (1st Cir. 1995); see also Buckley v. Fitzsimmons, 509 U.S. 259, 261 (1993) (in reviewing denial of motion to dismiss upon finding no absolute immunity, "we make two important assumptions about the case: first, that petitioner's allegations are entirely true; and, second, that they allege constitutional violations for which § 1983 provides a remedy"). Accordingly, we recount the events at issue as the complaint presents them.

Filler was married to Ligia Filler, now known as Isabella L. Arguetta ("Arguetta") in 1995. Filler and Arguetta subsequently had two children together. In 2007, Filler initiated a separation from Arguetta, and made plans to relocate with their children to another state. On April 24, 2007, Arguetta was involuntarily hospitalized at a psychiatric facility. She then made a series of allegations of abuse against Filler for the purpose of gaining custody over the children.

Filler was arrested on April 26, 2007, without a warrant. He was charged with gross sexual assault of Arguetta, and subject to a number of post-arrest restrictions. Upon arrest, Filler was held overnight without bail. On April 27, a bail hearing was held and he was allowed bail. His house remained subject to a bail lien for the next four years.

Gouldsboro Police Chief Guy Wycoff threatened to arrest Filler if Filler was released on bail and returned to his home. Filler therefore was forced to live in a hotel from April 27, 2007 until May 1, 2007, when Filler's attorney confirmed with Wycoff that Wycoff "had no authority nor any court order to bar or arrest [Filler] for returning to his own house." After returning to his home, Filler remained subject to a number of post-arrest restrictions, including restrictions on contact with his children, and a curfew from 8:00 p.m. to 6:00 a.m.

On August 8, 2007, a grand jury indicted Filler on five counts of Class A gross sexual assault and two counts of Class D assault. In January 2009, after trial, Filler was convicted of one count of Class A gross sexual assault and two misdemeanor charges of assault on Arguetta. The trial court subsequently overturned the guilty verdict and ordered a new trial based upon the trial court's finding of prosecutorial misconduct. These rulings were upheld by the Maine Law Court over Kellett's appeal.[1]

Following the Maine Law Court's ruling, Kellett told a local newspaper that she intended to "retry [Filler] on the three remaining charges." At the second trial, which took place in May 2011 and was conducted by a separate prosecutor, the jury acquitted

---

[1] The Maine Supreme Judicial Court sits as a court of law ("Maine Law Court") over cases on appeal from the District Court and Superior Court, as well as a limited number of other matters. See 4 Me. Rev. Stat. Ann. § 57.

Filler of all counts except one count of Class D assault. As the District Court highlighted, after the second trial was completed, the Maine Supreme Judicial Court "imposed discipline against . . . Kellett for a number of violations of the Maine Rules of Professional Conduct, the first disciplinary proceeding ever filed with the Maine Supreme Judicial Court by the Overseers of the Bar against a member of Maine's prosecutorial bar based on the prosecutor's representation of the State."

In the wake of these events, on February 4, 2015, Filler filed a sprawling civil suit against eighteen separate defendants, including Kellett. The key allegations against Kellett that are at issue in this interlocutory appeal arise out of Count I of the complaint, insofar as that count asserts a claim under 42 U.S.C. § 1983 for malicious prosecution in violation of Filler's Fourth Amendment rights. The count alleges, among other things, that (1) Kellett suppressed exculpatory evidence and tampered with evidence, and (2) Kellett advised or directed law enforcement officers not to comply with subpoenas that Filler's attorney submitted.

Those allegations are at issue in this appeal because, on March 16, 2015, Kellett filed a motion to dismiss Filler's § 1983 claim for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In that motion, Kellett raised a number of arguments as to the allegations now at issue.

First, Kellett's motion argued that Filler was time-barred from bringing a § 1983 claim against her arising out of much of the conduct alleged in Count I. Second, Kellett's motion argued that to the extent that Filler's § 1983 malicious prosecution claim against Kellett was based on the violation of Filler's right to due process, whether substantive or procedural, the claim was not cognizable. See Albright v. Oliver, 510 U.S. 266, 271 n.4 (1994) (holding that substantive due process does not "furnish the constitutional peg on which to hang" the tort of malicious prosecution in a § 1983 claim); Trafton v. Devlin, 43 F. Supp. 2d 56, 61 (D. Me. 1999) (noting that a § 1983 claim for the violation of procedural due process rights can exist only where, unlike here, "no adequate 'post-deprivation remedy' is available under state law" (quoting Pérez-Ruiz v. Crespo-Guillén, 25 F.3d 40, 42 (1st Cir. 1994))). Third, Kellett's motion argued that, insofar as Filler's § 1983 claim against her was premised on the violation of his Fourth Amendment rights, Kellett is entitled to absolute prosecutorial immunity. And finally, Kellett's motion contended that Filler had failed to make a prima facie showing of the state tort of malicious prosecution under Maine law.

In ruling on the motion to dismiss, the District Court concluded that Kellett was entitled to absolute immunity for her "consideration of the evidence, her decision whether to charge the case, what charges to present to the grand jury, and how to

- 7 -

prosecutor the charges," because these actions were all "intimately associated with the judicial phase of the criminal process." However, the District Court denied the rest of Kellett's motion to dismiss Count I of Filler's complaint.

Kellett now challenges the District Court's denial of her motion to dismiss the claim set forth in Count I.

**II.**

Because Kellett brings an interlocutory appeal, we have no jurisdiction over her challenges to the denial of her motion to dismiss that do not pertain to her defense of absolute immunity from Filler's claims under § 1983.[2]  See 28 U.S.C. § 1292(b); Limone v. Condon, 372 F.3d 39, 50 (1st Cir. 2004) (noting that the "general rule that only final judgments and orders are immediately appealable in civil cases" permits an exception for interlocutory review of an order rejecting an immunity defense that raises a legal question, but this exception does not confer jurisdiction over other contested issues in the case).  But while we do have

---

[2] Because our jurisdiction is limited, we do not address any of Kellett's arguments on the merits of Filler's § 1983 suit, including the scope of the Fourth Amendment malicious prosecution theory.  However, we note that recent cases have addressed this theory and should provide additional guidance for district courts. See Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 914-15 (2017) (establishing that a claim under § 1983 for unlawful pretrial detention is cognizable under the Fourth Amendment); Hernandez-Cuevas v. Taylor, 723 F.3d 91 (1st Cir. 2013) (holding that a "Fourth Amendment malicious prosecution claim" for unlawful pretrial detention is cognizable under § 1983).

interlocutory jurisdiction over her challenge to the District Court's ruling regarding absolute immunity, we have such jurisdiction only to the extent that her challenge turns on a question of law rather than fact. Hill v. Coppleson, 627 F.3d 601, 606 (7th Cir. 2010) (holding that the circuit court did not have jurisdiction over an interlocutory appeal from the district court's denial of summary judgment based on an assertion of immunity because evaluating the merits of the immunity defense depended on the resolution of a factual dispute concerning the prosecutor's function).

It has been observed that absolute immunity, unlike qualified immunity, only rarely turns on questions of fact. See Ellis v. Coffee Cty. Bd. of Registrars, 981 F.2d 1185, 1189 (11th Cir. 1993) ("Absolute immunity does not depend on good faith or reasonableness; thus [circuit courts] would be unlikely to find a case where disputed factual questions precluded review." (citation omitted)). But, that is not always the case. See Lawson v. Abrams, 863 F.2d 260, 263 (2d Cir. 1988) (holding that the district court's order allowing the filing of an amended complaint was not immediately appealable even though the defendant prosecutors claimed absolute immunity where the plaintiff's claims "d[id] not clearly reveal the degree to which the conduct relied on could be considered part" of the prosecutor's function and therefore holding that "the availability of the defense of absolute

- 9 -

immunity as to these claims must await the development of facts during discovery"). And it is not the case here. We thus conclude that we lack jurisdiction over this interlocutory appeal.

To understand why, it is helpful to understand the legal framework underlying prosecutorial absolute immunity. We thus start by providing some brief background before applying the relevant legal principles to the absolute immunity issues that this interlocutory appeal presents.

**A.**

State prosecutors are entitled to absolute immunity from liability under § 1983 to the extent that such immunity is "necessary to protect the judicial process." Burns v. Reed, 500 U.S. 478, 485 (1991) (citing Imbler v. Pachtman, 424 U.S. 409, 422-23 (1976)). This reflects our "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and . . . would shade his decisions instead of exercising the independence of judgment required by his public trust." Id. (quoting Imbler, 424 U.S. at 423).

Because "[a]bsolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation," id. at 494 (emphasis in original) (citation omitted), "[t]hat concern . . . justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's

- 10 -

role in judicial proceedings," id. Accordingly, a prosecutor has absolute immunity when functioning as an "advocate" for the state in "initiating a prosecution and in presenting the State's case," Imbler, 424 U.S. at 431, because that conduct is "intimately associated with the judicial phase of the criminal process," id. at 430. However, a prosecutor does not receive absolute immunity when acting "in the role of an administrator or investigative officer." Id. at 430-31. Rather, "no more than a qualified immunity is available with respect to acts of a prosecutor that are administrative or investigative in nature." Lawson, 863 F.2d at 263.

Importantly, absolute immunity does not necessarily apply to all actions that a prosecutor may take once the "judicial phase" begins. In Buckley, for example, the Supreme Court considered whether a prosecutor enjoyed absolute immunity for making false statements during a press conference that the prosecutor gave announcing the return of an indictment. 509 U.S. at 261. Buckley held that the prosecutor did not have absolute immunity because (1) there was not a common-law immunity for a prosecutor's out-of-court statements to the press; and (2) comments to the press are not made in a prosecutor's role as advocate for the state. Id. at 277.

Buckley explained:

> The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutor's job, and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and . . . qualified immunity is the norm for them.

Id. at 278 (citations omitted). Buckley then concluded that "[w]hen, as here, the prosecutorial function is not within the advocate's role and there is no historical tradition of immunity on which we can draw, our inquiry is at an end." Id.

**B.**

In light of these principles, the key question in this case concerns whether the functions that Kellett was allegedly performing were functions for which she enjoys absolute immunity. We begin with Kellett's assertion that she is entitled to absolute immunity for giving legal advice to police officers regarding Filler's subpoenas. We then turn to Kellett's assertion that she is entitled to absolute immunity for withholding and tampering with exculpatory evidence (taking these allegations to be true, as we must).

Kellett emphasizes that "a prosecutor cannot be held personally liable for the knowing suppression of exculpatory information" during the judicial phase, even where "prosecutors failed to disclose exculpatory evidence specifically requested by

- 12 -

the defense and where prosecutors misled the trial court in order to conceal their failure to disclose exculpatory evidence." Reid v. New Hampshire, 56 F.3d 332, 336 (1st Cir. 1995) (citation omitted). And Kellett contends that "Filler is trying to get around the rule of immunity for withholding exculpatory evidence by reframing his claim as one about giving legal advice."

Kellett's "end-run" contention, however, is too fact-dependent for us to be able to review it at this time. Count I of the complaint alleges that Kellett "assumed the role of legal counsel" to law enforcement officers, "and advised them not to comply with lawful defense . . . subpoenas." But, it is not at all clear that, in advancing the assertion that Filler is merely attempting an "end run," Kellett is presenting a legal argument that she is entitled to absolute immunity based on the facts set forth in the complaint, rather than a factual argument that she is entitled to absolute immunity based on her distinct understanding of the facts that transpired.

Filler contends, for example, that he was involved in civil custody and divorce proceedings at the same time as his criminal prosecution, and he claims that he sought at least one of the relevant subpoenas for use in the civil, rather than criminal, proceedings, though it is not clear exactly to which subpoenas he refers. Yet Kellett, in contending that she has absolute immunity for all of the legal advice and direction that Count I alleges she

gave, does not make clear what understanding she has of the circumstances under which she gave advice regarding the subpoenas referenced in Filler's complaint. As a result, we find ourselves in a situation where Filler's claims against Kellett are "not clearly foreclosed and . . . do not clearly reveal the degree to which the conduct relied on could be considered part of the decision to prosecute or intimately associated with the judicial proceedings, rather than purely investigative or administrative." Lawson, 863 F.2d at 263. In consequence, the "the availability of the defense of absolute immunity as to these claims must await the development of facts during discovery." Id.

Kellett does contend in this regard that, because the advice was given after the case against Filler was initiated, she was necessarily acting in her prosecutorial capacity and thus entitled as a matter of law to absolute immunity. But, as we have noted, the fact that a prosecutor engaged in certain activities after a prosecution had already commenced is not necessarily dispositive of the question whether absolute immunity attaches. See Buckley, 509 U.S. at 278 (noting that a prosecutor is not entitled to absolute immunity for actions taken even after the commencement of the judicial phase if the actions "[do] not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions").

- 14 -

A similar problem prevents us from reviewing Kellett's assertion of absolute immunity as it relates to the allegations in Count I that Kellett tampered with and withheld exculpatory evidence.[3] To be sure, Filler does argue that Kellett cannot claim absolute immunity with respect to any of her actions implicated by this set of allegations because these allegations concern conduct that occurred prior to his indictment. But, in this case, the indictment followed the arrest. It is thus not the only critical point in time for purposes of determining the beginning of the judicial phase. See Buckley, 509 U.S. at 273-74 & n.5 (emphasizing that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested" and clarifying that, although necessary to the successful assertion of absolute immunity, a probable-cause determination is not sufficient); Genzler v. Longanbach, 410 F.3d 630, 639 (9th Cir. 2005) ("Absolute immunity [cannot] be invoked before probable cause was established."); Goldstein v. Moatz, 364 F.3d 205, 214-15 (4th Cir. 2004) (noting that prosecutors "do not enjoy absolute immunity for acts committed prior to a probable

_____

[3] In an amicus brief, the American Civil Liberties Union ("ACLU"), the ACLU of Maine Foundation, and the Maine Association of Criminal Defense Lawyers argue that tampering with evidence is distinguishable from withholding exculpatory evidence, and should not be similarly entitled to absolute immunity. The parties themselves, however, have not briefed this issue to us. And, given the unclear nature of the record before us, we do not address the issue.

- 15 -

cause determination" because "[o]nce a prosecutor possesses probable cause, he must decide whether to prosecute, which charges to initiate, what trial strategy to pursue, and a multitude of other important issues that require him to exercise discretion," and highlighting that "[i]n a pre-probable-cause investigation . . . a prosecutor exercises no more discretion than a police officer and thus should enjoy no more protection than qualified immunity"); Hill v. City of N.Y., 45 F.3d 653, 661 (2d Cir. 1995) ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts.").

Nevertheless, even if Kellett may have a basis for asserting the absolute immunity defense, she does not identify with any specificity why she is entitled to immunity with respect to the allegations in Count I that pertain to her treatment of evidence. And it is by no means clear that every allegation in Filler's complaint concerning such treatment by her occurred during the judicial rather than the investigative phase. For example, Filler's complaint alleges that "[o]n or about April 25, 2007," -- that is, the day before Filler's arrest on April 26, 2007 -- "Kellett engaged in or supported and approved of[] the falsification of an April 25, 2007 videotape interview of Arguetta by Wycoff."

In light of the undifferentiated nature of Kellett's assertion of absolute immunity with respect to her treatment of evidence, it is unclear whether the parties' dispute over immunity with respect to the allegations in Count I concerning the treatment of potentially exculpatory evidence is a legal one about what protection the law affords a prosecutor either before or during the judicial phase, or instead a factual one about when the alleged conduct occurred.

In consequence, we also lack jurisdiction to review this aspect of her absolute immunity defense in this interlocutory appeal. For, here, too, while Filler's claim against Kellett is not "clearly foreclosed" by absolute immunity, "the availability of the defense of absolute immunity as to these claims must await the development of facts during discovery." Lawson, 863 F.2d at 263; see also Hill, 45 F.3d at 663 (holding that where "immunity issue respecting the [fabrication of videotapes] raises factual issues that cannot be conclusively determined at this stage in the litigation," the court "[had] no jurisdiction to entertain it").

## III.

For the foregoing reasons, the appeal is **dismissed**.