# United States Court of Appeals
## For the First Circuit

No. 18-2062

SCOTT JORDAN, JR.,

Plaintiff, Appellant,

v.

TOWN OF WALDOBORO; WILLIAM LABOMBARDE,
Waldoboro Chief of Police; LAWRENCE W. HESSELTINE, JR.,
Waldoboro Police Officer; JEFFERY FULLER,
Waldoboro Police Officer; ANDREW SANTHESON,
Waldoboro Police Officer,

Defendants, Appellees,

WALDOBORO POLICE DEPARTMENT,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John H. Rich III, U.S. Magistrate Judge]

Before

Howard, Chief Judge,
Kayatta and Barron, Circuit Judges.

Karen Wolfram, with whom Fairfield & Associates, P.A. was on brief, for appellant.
Kasia S. Park, with whom Edward R. Benjamin, Jr. and Drummond Woodsum were on brief, for appellees.

November 27, 2019

**KAYATTA**, <u>Circuit Judge</u>.  Scott M. Jordan ("Senior"), his health failing, executed a Power of Attorney (POA) authorizing his son, Scott M. Jordan, Jr. ("Jordan"), to take control and dispose of Senior's property in any way Senior might do were he able. Unhappy with Jordan's subsequent decisions concerning his property, Senior revoked the POA and complained to the Waldoboro Police Department.  Waldoboro Police Officers obtained a warrant to search Jordan's home for Senior's property, and after finding Senior's property there, arrested Jordan for theft.  The district attorney dismissed the criminal prosecution after Senior died.

Jordan brought this civil rights action against the Town of Waldoboro, the Waldoboro Police Department, and several Waldoboro Police Officers.  He alleged that the affidavit accompanying the search warrant contained intentional or reckless omissions and misstatements of fact, that an accurate affidavit would not have supported probable cause for the search of his home, and that there was no probable cause for his arrest.  A magistrate judge, sitting as the district court with the consent of the parties, granted summary judgment for the defendants, dismissing all of Jordan's claims.  Jordan timely appealed to this court. For the following reasons, we reverse in part and affirm in part.

**I.**

In this appeal from the entry of summary judgment, we take the facts in the light most favorable to Jordan. See Staples v. Gerry, 923 F.3d 7, 14 (1st Cir. 2019).

Jordan was employed in the corrections division of the Cumberland County Sheriff's office. As of May 2014, Senior was living independently at his home in Waldoboro, Maine, while Jordan and Jordan's daughter lived together in Standish, Maine. Jordan and Senior made plans for Senior to move in with Jordan and his daughter. They agreed that, in anticipation of the move, Jordan would help fix up Senior's home and sell some of Senior's property so that Senior's home could be rented or sold.

On May 12, 2014, Senior was taken by ambulance to the hospital, where he was admitted for progressive confusion. After improving, Senior was discharged on May 23, 2014, but the next day he was "[u]nresponsive" and "not able to provide any answers to questions" and returned to the hospital. Senior was in and out of the hospital through July of 2014.

In accordance with Senior and Junior's plan for Junior to sell some of Senior's property, on May 15, 2014, during Senior's initial hospitalization, Senior directed his attorney to draft an Appointment of Agent Financial Power of Attorney appointing Jordan as his agent and attorney-in-fact. Senior executed the POA before a witness and a notary public. The notary public noted that Senior

- 4 -

was "alert and oriented."  The POA granted Jordan "full power to exercise or perform any act, power, duty, right, or obligation whatsoever . . . relating to any person, matter, transaction, or property, real or personal, tangible, intangible, or mixed, now owned or hereafter acquired by [Senior], as [Senior] might or could do if personally present."  It listed "by way of example" several "specifically enumerated powers" that did not limit the broad authority quoted above.  One of those enumerated powers was to "make gifts of any property . . . as [Jordan] may consider advisable or appropriate, which gifts may be made to or for the benefit of [Jordan]."  Another was to sell "any property whatsoever," "or any right or interest thereon, or any part thereof, upon such terms as [Jordan] shall think proper."

Central to this case are Senior's complaints about the actions Jordan took pursuant to the POA.  Acting as Senior's agent and attorney-in-fact, Jordan either transferred to himself or sold much of Senior's personal property, and he also withdrew money from Senior's accounts.  Jordan maintained that he took these actions in accordance with the plan he and Senior had developed and in order to facilitate and fund his efforts to take care of his father.  Senior claimed that Jordan acted contrary to his wishes.

On July 27, 2014, while out of the hospital, Senior reported to the Waldoboro Police Department that Jordan had

assaulted him. Defendant Andrew Santheson, a Waldoboro Police Officer, spoke to Jordan over the phone. Jordan said the dispute began with an argument over Jordan's decision to register Senior's truck in Jordan's name. Neither party desired criminal prosecution of the other, and neither provided a statement, so Santheson investigated no further.

Senior took no steps to revoke the POA until July 31, 2014, when he sent Jordan a notice of revocation. That day, and in the week or so following, Senior made several demands that Jordan explain or undo the actions he took under the POA. Of relevance here, Senior demanded: (1) the return of his truck; (2) the return of three firearms; and (3) an accounting of the financial activities Jordan undertook on Senior's behalf, including "an explanation of the $3,000.00 worth of antiques which [Senior] believe[d] were sold." In a written response to Senior's attorney, Jordan explained that he and his father had agreed to put the truck in Jordan's name "in case [Senior] never came out of the hospital, and they went after his assets." Jordan refused to return the firearms, among other reasons, because he was concerned that Senior was suicidal. He also explained that, in selling Senior's property, he was acting as authorized under the POA, and that he did so to cover expenses associated with caring for his father and improving his father's house.

In the months that followed, Senior made multiple complaints to the Waldoboro Police Department about the actions Jordan took under the POA prior to its revocation. In a written statement dated October 10, Senior stated that, while hospitalized, "my son came to me about making him my power of attorney," and that "I did not read it and don't feel at this time I should have signed it." Senior conceded that he and Jordan planned to move in together in Standish, and that he had authorized Jordan to sell some of his things and do some work on his house, but complained that Jordan held the sale while Senior was hospitalized even though Senior wanted to be present.

On October 17, Senior told defendant Jeffrey Fuller, a Waldoboro Police Officer, that he had been hospitalized as a result of a liver condition that at times made him feel confused and act abnormally. He explained to Fuller and defendant Lawrence Hesseltine, also a Waldoboro Police Officer, that he had executed a POA and that, pursuant to it, Jordan had taken his truck, transferred ownership to himself, and was refusing Senior's demands to return it. Senior acknowledged that Jordan left his own truck for Senior to use, but said that Jordan's truck was too large for him. Hesseltine confirmed that the title to Senior's former truck was in Jordan's name. Senior also complained that Jordan was refusing to return several firearms. Fuller asked

Senior to provide him a copy of the POA, which Senior delivered to the Waldoboro police station the next day.

Also on October 17, after taking Senior's complaint, Fuller spoke to Jordan by telephone. Jordan told Fuller about Senior's plan to move in with him and explained that he had started executing the plan before Senior changed his mind about it. Jordan said he had spent a large amount of time and money fixing up his father's home. When asked if he intended to return his father's firearms, Jordan responded that he did not because his father was not mentally stable. Jordan asked Fuller if the police department might take the firearms for safekeeping, but Fuller responded that the police would have no legal basis to refuse to return the firearms to Senior.

Hesseltine then took over the investigation from Fuller, who left for an extended vacation. Hesseltine received all the documents Senior and Jordan provided to Fuller, including the POA. On November 1, Hesseltine met with Senior about the complaint. Senior told Hesseltine that, while the POA was in effect, Jordan had sold upwards of $5,000 of Senior's personal property and withdrawn more than $2,000 in Social Security and Veterans Administration benefits from Senior's bank account. Senior gave Hesseltine copies of the revocation of the POA and the July and August correspondence between Senior's attorney and Jordan.

Some time that fall, Hesseltine and defendant William Labombarde, Waldoboro Chief of Police, called Senior's sister, Raeberta Myers, asking for her "help in clarifying things." They explained that they had spoken to Senior, and that they "understood [Junior] had pushed [Senior] into signing a [POA] while he was not in his right mind." Myers told the officers that "this was definitely not true." Myers described a phone call she had with Senior before he was hospitalized. In that phone call, Senior explained that he intended to grant Jordan a POA and that he planned to have his lawyer draft one. Myers knew that Senior and Jordan had "knocked heads" in the past, but she asked Senior "a number of times" if he was sure about this plan, and "each time he assured [her that it was] what he wanted to do." Myers told the officers that Senior "knew exactly what he wanted and what he was doing" at the time. Myers "had the feeling that [the officers] did not like what [she] had told them about [Senior] and the [POA]."

On November 18, 2014, Senior reported to the Waldoboro Police that he had learned that Jordan was planning to sell the truck Senior wanted back. Hesseltine found an online posting in which Jordan offered to sell the truck for $7,900. That day, Senior also provided Hesseltine with a copy of a $305 AT&T Wireless bill for a cell phone account that had been opened in Senior's name but that was associated with Jordan's cell phone number.

On November 20, Hesseltine wrote and filed in Maine district court an affidavit and request for a warrant to search Jordan's residence as well as any vehicles, boats, and outbuildings on the premises. The warrant provided for the seizure of Senior's property, specifically listing the truck, the firearms, and any financial documentation relating to the disposition of Senior's property. Much of this appeal concerns the content of the affidavit accompanying the search warrant, which we will discuss in detail below. Before Hesseltine filed the affidavit and request, Labombarde and Assistant District Attorney Andrew Wright reviewed it. A Maine district court judge granted the request that same day.

On November 21, Hesseltine, Santheson, and Maine State Police officers executed the warrant at Jordan's property. As expected, they found Senior's truck parked in Jordan's driveway. In the glove compartment, officers found the title to the truck as well as a bill of sale, signed by Senior, granting the truck to Jordan. Officers also recovered the firearms. Jordan told Hesseltine that he had sold all of the other personal property he had taken from Senior's home.

Hesseltine arrested Jordan without a warrant for Class B theft by unauthorized taking or transfer.[1] Hesseltine and

---

[1] "A person is guilty of theft if . . . [t]he person obtains or exercises unauthorized control over the property of another

Santheson took Jordan to the local jail, where he was released the same day on a $5,000 bond. Foreseeably, the local press coverage latched on to the story of a corrections officer being arrested for stealing from his ill father.

A Lincoln County grand jury convened to consider Jordan's charges. Hesseltine, Senior, and Jordan all testified before the grand jury. The District Attorney used the POA while questioning Hesseltine, but Hesseltine recalls telling the grand jury only "that there was [a POA] in effect and then it was rescinded." Jordan explained to the grand jury that Senior's attorney drafted the POA. There is no evidence in the record that the grand jury viewed a copy of the POA or learned about its broad grant of power to Jordan. On March 10, 2015, the grand jury returned an indictment against Jordan for five counts of Class B theft.

Senior died in early September, 2015. The Lincoln County District Attorney's Office dismissed the criminal proceedings against Jordan for want of the "victim and key witness." Because of his bail conditions, Jordan was unable to see Senior again before his death.

---

with intent to deprive the other person of the property." Me. Stat. tit. 17-A, § 353(1)(A). Theft by unauthorized taking is a Class B crime if "[t]he value of the property is more than $10,000" or "[t]he property stolen is a firearm or an explosive device." Id. § 353(1)(B)(1)-(2).

Jordan brought this civil rights action against the Town of Waldoboro, the Waldoboro Police Department, Chief of Police Labombarde, and Officers Fuller, Hesseltine, and Santheson. Under the federal civil rights statute, 42 U.S.C. § 1983, he alleged Fourth Amendment violations of unlawful search and seizure, false arrest, malicious prosecution, and "due process/defamation." He also brought Maine state constitutional claims for false arrest and unlawful search and seizure under the Maine Civil Rights Act, Me. Rev. Stat. tit. 5, § 4682, as well as Maine tort claims for malicious prosecution, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, defamation, and false light. Jordan sought compensatory and punitive damages. Invoking federal question jurisdiction, 28 U.S.C. §§ 1331, 1367, the defendants removed the case to the United States District Court for the District of Maine. The parties stipulated to the dismissal of the defamation claims against all defendants and the false light claim against two of the defendants. Adjudicating the case with the consent of the parties, a magistrate judge entered summary judgment in favor of the defendants on all remaining counts.

On appeal, Jordan challenges the entry of summary judgment on: (1) the federal and state constitutional claims for search and seizure; (2) the federal and state constitutional claims for false arrest; (3) the federal and state constitutional

claims for malicious prosecution; (4) the Maine tort claims for malicious prosecution and false imprisonment; and (5) the request for punitive damages.  We take up each issue in turn.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We review de novo the grant of summary judgment, "under the identical criteria governing the district court."  Hegarty v. Somerset Cty., 53 F.3d 1367, 1372 (1st Cir. 1995).

## A.

We begin with Jordan's claim that the defendants violated his rights under the Fourth Amendment to the U.S. Constitution and article 1, section 5 of the Maine Constitution by searching and seizing his property.[2]  The search warrant executed by a judicial officer stands as an imposing impediment to this claim.  The Fourth Amendment countenances searches conducted pursuant to warrants issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Jordan seeks to overcome this impediment by contending

---

[2] The parties agree that relevant Maine law tracks the requirements of the Fourth Amendment and 42 U.S.C. § 1983, so we will assume that to be so.

- 13 -

that the warrant was invalid because the officers procured it by deliberately misleading the Maine district court judge who granted it.

The rules for challenging a warrant by attacking the affidavit used to procure it trace to the Supreme Court's opinion in Franks v. Delaware, 438 U.S. 154 (1978). Franks addressed the showing a defendant must make in order to suppress the fruits of a search by proving that a facially valid warrant was invalidly obtained. Franks held that a search warrant must be voided if (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit"; and (2) "the affidavit's remaining content is insufficient to establish probable cause." Id. at 155–56; see also United States v. Owens, 917 F.3d 26, 38 (1st Cir. 2019). We have since drawn on Franks to observe that "[a]n officer who obtain[ed] a warrant through material false statements which result[ed] in an unconstitutional search may be held personally liable for his actions under § 1983." Aponte Matos v. Toledo Dávila, 135 F.3d 182, 187 (1st Cir. 1998).

To apply Franks in this case, we find it helpful to break the two-prong test into its three elements: The affidavit need contain a falsehood; the falsehood must be such that its deletion would eliminate probable cause; and the falsehood must have been

made deliberately, or at least with reckless disregard for the truth. We address each element in turn.

**1.**

In examining the affidavit for the presence of falsehoods, we look not only for affirmative misrepresentations, but also for material omissions. United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015) ("Material omissions from a warrant affidavit also may furnish the basis for a successful Franks challenge."). We conclude that the record in this case would allow a jury to find that there was at least one affirmative misrepresentation and two material omissions.

First, the affidavit plainly suggested that Jordan prepared the POA and foisted it on his ill father. The affidavit stated that Jordan "presented [Senior] with paperwork requesting he appoint himself as his father's [f]inancial [POA]." But, as Myers explained, even before his hospitalization Senior intended to give Jordan a POA, and Senior's own attorney eventually prepared the POA at Senior's behest.

Second, Hesseltine's affidavit failed to disclose that the POA (which Hesseltine did not attach to the affidavit) expressly provided for the type of self-dealing in which Jordan engaged, and which Jordan claimed was his father's basic purpose in granting the POA.

- 15 -

Third, although the affidavit acknowledged Jordan's claim that he took his father's firearms because he feared that his father might harm himself, it omitted the highly corroborating fact that Jordan offered to turn over the firearms to the police for safekeeping.

The defendants argue -- and the magistrate judge in this federal case agreed -- that the foregoing omissions are not relevant to the Franks analysis because "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." Jordan v. Town of Waldoboro, No. 2:17-CV-00025-JHR, 2018 WL 4688724, at *9 (D. Me. Sept. 28, 2018) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 588 (2018)). But Jordan is not arguing that the police had to rule out his innocent explanations. Rather, he argues that his offer to give the firearms to the police as well as the provenance and terms of the POA were undisputed facts that were material to the assessment of the conduct described in the affidavit. And as we have said, material omissions can be the basis of a Fourth Amendment violation if all three elements of Franks's two-part test are satisfied. See United States v. Hadfield, 918 F.2d 987, 992 (1st Cir. 1990).

**2.**

We turn now to the question of whether a more complete and accurate affidavit would have nevertheless supported a finding of probable cause for the search and seizure. In answering this

question, we "take into account the cumulative effect of the multiple omissions" and misstatements in the affidavit.  United States v. Vigeant, 176 F.3d 565, 572 n.8 (1st Cir. 1999).

Though only a jury can resolve reasonably disputed issues of fact, whether a given set of facts constitutes probable cause is a legal question.  See Ornelas v. United States, 517 U.S. 690, 699 (1996); Dir. Gen. of R.R.s v. Kastenbaum, 263 U.S. 25, 28 (1923) ("Probable cause is a mixed question of law and fact.  The court submits the evidence of it to the jury, with instructions as to what facts will amount to probable cause if proved."); Bolton v. Taylor, 367 F.3d 5, 8 (1st Cir. 2004) ("[N]o deference should be given to the fact-finder as to probable cause or reasonable suspicion where the raw facts are undisputed or settled and the only issue is one of law application.").

In assessing whether probable cause exists, we consider "the whole picture."  Wesby, 138 S. Ct. at 588 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).  Probable cause does not require proof of guilt beyond a reasonable doubt, but "only an objectively reasonable basis for believing 'that evidence of [the crime] can likely be found at the described locus at the time of the search.'"  United States v. Flores, 888 F.3d 537, 548 (1st Cir. 2018) (alteration in original) (quoting United States v. Floyd, 740 F.3d 22, 32 (1st Cir. 2014)).

The probable cause question here turns on the underlying Maine law. As noted above, "[a] person is guilty of theft if . . . [t]he person obtains or exercises unauthorized control over the property of another with intent to deprive the other person of the property." Me. Rev. Stat. tit. 17-A, § 353(a). The critical question is whether the affidavit, had it not contained the above-noted deficiencies, would still have established probable cause to believe that Jordan's exercise of control over Senior's property was unauthorized.

The origin and terms of the POA weigh heavily in favor of a "no" answer to this question because it expressly granted Jordan the authority to take control of Senior's property. The affidavit sought to diminish the exculpatory weight of the POA by giving the impression that Jordan prepared the POA and foisted it on his befuddled parent. In other words, it tacitly suggested that the POA was not validly executed and therefore that it could not authorize the seizure. But once one learns that the POA was the product of pre-hospitalization discussions, that Senior's lawyer prepared the POA, and that Senior authorized Jordan to transfer property to himself, all of Jordan's behavior is cast in a very different, markedly benign light.

The defendants try another tack, arguing that the POA, although legitimately executed, did not actually grant Jordan authority to transfer Senior's property to himself because any

- 18 -

such grant of power would be invalid under Maine law. They point out that the Maine Uniform Power of Attorney Act, Me. Rev. Stat. tit. 18-A, § 5-914, incorporates section 802 of the Maine Uniform Trust Code, which in turn provides that "[a] trustee shall administer the trust solely in the interests of the beneficiaries." Me. Rev. Stat. tit. 18-B, § 802(1). But under that section of the Trust Code, a trustee has no such duty if "[t]he transaction was authorized by the terms of the trust." Id. § 802(2)(A). Leaving no doubt on this point, the Maine Uniform Power of Attorney Act provides that the agent shall "[a]ct loyally for the principal's benefit," "[e]xcept as otherwise provided in the power of attorney." Me. Rev. Stat. tit. 18-A, § 5-914(b)(1) (emphasis added). Therefore, since the POA expressly authorized the challenged self-dealing, Jordan was not obligated to act solely in Senior's interests.

Jordan still had the basic obligation under Maine law to "[a]ct in accordance with the principal's reasonable expectations to the extent actually known by the agent." Id. § 5-914(a)(1) (emphasis added). The defendants argue that Jordan violated this duty by declining to follow Senior's directives about the disposition of Senior property. But the POA authorized Junior to "make gifts of any property . . . as [Jordan] may consider advisable or appropriate, which gifts may be made to or for the benefit of [Jordan]." This express authorization to sell any

property seriously undercuts any argument that Senior reasonably expected Jordan to keep Senior's property in Senior's name. Moreover, Jordan maintains that he took all the disputed actions in furtherance of a plan he and Senior agreed to before Senior executed the POA. There is no evidence that Senior ever denied the existence of the pre-hospitalization plan to move assets out of his name by having his lawyer prepare a POA that granted Jordan discretion to decide what property to sell. And Myers confirmed the existence of the pre-hospitalization plan. Moreover, everything Jordan did is consistent with that plan. Conversely, Senior's belated, post-hospitalization critique of Jordan's actions seemed inconsistent with his reason for granting the POA in the first place. Under these circumstances, it seems implausible that Jordan "actually kn[ew]" that Senior "reasonabl[y] expect[ed]" Jordan to cease implementing their pre-hospitalization agreement. Id.[3]

Seriously weakened by the facts concerning the provenance and breadth of the POA, the affidavit's remaining

---

[3] Maine law also makes it an affirmative defense to theft "that the defendant acted in good faith under a claim of right to property." Me. Rev. Stat. tit. 17-A, § 361. We do not address, however, whether the officers violated the Fourth Amendment by failing to include known facts that established an affirmative defense, because Jordan has made no such claim. See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief.").

inculpatory force would further dissipate if the affidavit correctly described Jordan's offer to give the firearms to the police. A reader of the affidavit might think that Jordan's stated reason for taking the firearms was pretextual. Indeed, the fact that the warrant authorized the officers to search for the very same firearms that Jordan had offered to the police suggests that the Maine district court judge believed that Jordan took the guns for his own benefit. Once one includes in the picture Jordan's undisputed proffer, such a belief becomes implausible.

Collectively, correction of the misrepresentation and the two omissions would have painted a fundamentally different picture of Jordan's actions in trying to assist an episodically confused and often hostile parent. It is not a reasonable picture of a thief in action and, thus, would fall short of establishing probable cause for a search warrant.

**3.**

That leaves the matter of state of mind. Officers can easily forget information or fail to perceive its significance in seeking warrants, so the law provides no evidentiary exclusion or legal liability for such errors, even when made negligently. Franks, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient."); Tanguay, 787 F.3d at 49 ("Negligent omissions -- even negligent omissions of highly probative information -- do not satisfy [the Franks] standard."). For Jordan

to prevail, there must be evidence upon which a jury could reasonably find that the defects in the affidavit were made "knowingly and intentionally, or with reckless disregard for the truth." Franks, 438 U.S. at 155 (1978). And in the case of omissions, there is an additional element: "Because there is no requirement that every shred of known information be included in a warrant affidavit," an omission satisfies the Franks test "only if it is 'designed to mislead or . . . made in reckless disregard of whether [it] would mislead, the magistrate' in his appraisal of the affidavit." Tanguay, 787 F.3d at 49 (alterations in original) (quoting United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir. 1990)).

Determining an actor's mental state is traditionally a role for the jury. See Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983) (noting that "where, as here, the state of mind of one of the parties is crucial to the outcome of the case," "courts are particularly cautious about granting summary judgment").

An intent to deceive, and certainly recklessness, need not be proven by direct evidence. "In the case of allegedly material omissions, 'recklessness may be inferred where the omitted information was critical to the probable cause determination.'" Burke v. Town of Walpole, 405 F.3d 66, 81–82 (1st Cir. 2005) (quoting Golino v. New Haven, 950 F.2d 864, 871

- 22 -

(2d Cir. 1991)); see also United States v. Gifford, 727 F.3d 92, 101 (1st Cir. 2013) (inferring recklessness from the omission of critical information).

Viewing the record as a whole, we find that there is enough evidence that a jury could reasonably conclude that Hesseltine had such a mental state. As for the misrepresentation, the jury could decide -- based on Myers's testimony -- that Hesseltine, at best, recklessly disregarded the true origins of the POA, and that the exculpatory force of the correct information would have been obvious to him. As for the omissions, the defendants conceded that Fuller disclosed to Hesseltine all the information he received from Senior and Junior, which would include the terms of the POA and the fact that Junior offered to turn the firearms over to the Waldoboro Police Department. And if jurors concluded that the misrepresentation was the result of an intent to deceive the judicial officer to serve a warrant, it would require no unreasonable leap to find that the two omissions were part of the same effort.

We conclude, therefore, that the record viewed favorably to Jordan would support findings satisfying all three elements of the Franks test: The affidavit contained a false statement and two omissions; correction of those three deficiencies, collectively, would eliminate probable cause; and those three deficiencies were designed to mislead or made in reckless disregard

of whether they would mislead the magistrate in considering whether to issue a warrant. The magistrate judge therefore erred by granting summary judgment on the claims under the federal and state civil rights acts that the officers unlawfully searched Jordan's property. Instead, a factfinder will need to determine that the POA was Senior's idea and the handiwork of his lawyer, that it contained a clause allowing transfers to Jordan, and that Jordan offered the firearms to the police. The factfinder would further need to find that a defendant[4] knew (or recklessly disregarded) all three facts, and that through the combined use of falsehoods and omissions the defendant prepared an affidavit designed to mislead (or made in reckless disregard of whether it would mislead) the judicial officer in his appraisal of the affidavit.

**B.**

We turn now to Jordan's argument that the magistrate judge erroneously granted summary judgment on Jordan's federal and state civil rights claims for false arrest. Again, both parties assume that the disposition of the federal claim controls the disposition of the parallel state constitutional claim, so we assume as much as well.

To make a claim for false arrest, Jordan must show that an arresting officer lacked probable cause to believe that Jordan

---

[4] See infra Part II.E.

had committed theft.  See Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009).  The only fact that distinguishes this probable cause analysis from the preceding one is that the officers, while conducting the search, found a title to the truck in Jordan's name, signed by Senior -- further indication that Senior consented to swapping trucks.  This additional piece of evidence shrunk the already insufficient probability that the transfer of ownership of the truck was unauthorized.  We therefore conclude, a fortiori, that a reasonable juror could find that anyone aware of the deficiencies in the warrant application would know (or recklessly disregard the fact that) there was no probable cause to arrest Jordan.

## c.

Next, Jordan argues that the magistrate erred in granting summary judgment for the defendants on his federal constitutional claims for malicious prosecution.  The parties agree that to make out a claim for malicious prosecution, Jordan must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)). The district court held that -- even assuming Jordan could meet the first two requirements -- he could not show that the criminal

proceedings terminated in his favor, and it therefore concluded that summary judgment was appropriate.

It was recently a live question in our circuit whether post-Hernandez-Cuevas Supreme Court precedent rendered the favorable termination element "an anachronism." See Pagán-González, 919 F.3d at 609 (Barron, J., concurring) (citing Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 925–26 (2017) (Alito, J., dissenting)). But the Supreme Court arguably resolved this question when it reiterated that a plaintiff cannot bring a section 1983 fabricated-evidence claim that is analogous to the common-law tort of malicious prosecution "prior to favorable termination of [the] prosecution." McDonough v. Smith, 139 S. Ct. 2149, 2156 (2019). And in any event, Jordan's brief to this court accepts the Hernandez-Cuevas elements, and Jordan has therefore waived any argument that he need not satisfy the favorable termination element of a malicious prosecution claim. See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015).

So, we face the question of whether the state criminal proceedings against Jordan terminated in Jordan's favor. Hernandez-Cuevas, 723 F.3d at 101. Jordan concedes that, to satisfy the favorable termination element, a plaintiff must show that the prosecution was terminated in such a way as to imply the plaintiff's innocence. See Restatement (Second) of Torts § 660

cmt. a (1977) ("Proceedings are 'terminated in favor of the accused' . . . only when their final disposition is such as to indicate the innocence of the accused."); cf. Jones v. City of Boston, 135 F. App'x 439, 440 (1st Cir. 2005) (unpublished opinion) (affirming the dismissal of a constitutional malicious prosecution claim because the plaintiff did "not allege facts that would permit an inference that the charges were dismissed because of his innocence or the Commonwealth's lack of reasonable grounds for the prosecution").

The district attorney dismissed the criminal proceedings against Jordan because "[t]he victim and key witness in the case for the State, Scott Jordan[,] Sr[.], ha[d] died." Jordan contends that this dismissal was "indicative of innocence." To support this claim, Jordan cites section 660 of the Restatement (Second) of Torts, which lists examples of terminations insufficient to state a malicious prosecution claim.[5]

---

[5] Section 660 provides:

> A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if
>
> (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused; or
>
> (b) the charge is withdrawn or the prosecution abandoned because of misconduct on the part of

Jordan argues that, since none of the enumerated circumstances describes the reason for the dismissal of his criminal case, we should conclude that the dismissal was a favorable termination. However, the Restatement itself makes clear that section 660's list of insufficiently favorable reasons for termination is not exhaustive; section 661 states that "[t]he formal abandonment of proceedings by a public prosecutor is not a sufficient termination in favor of the accused if the abandonment is due to the impossibility or impracticability of bringing the accused to trial." Jordan's criminal case was dismissed because the death of the key witness made the prosecution impracticable. Therefore, the dismissal was not sufficiently favorable to the accused, and Jordan cannot satisfy the favorable termination element under Hernandez-Cuevas, 723 F.3d at 101.[6]

the accused or in his behalf for the purpose of preventing proper trial; or

(c) the charge is withdrawn or the proceeding abandoned out of mercy requested or accepted by the accused; or

(d) new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused.

[6] Oddly, and possibly for no good reason as Judge Barron's concurring opinion explains, a malicious prosecution claim appears to require favorable termination, McDonough, 139 S. Ct. at 2156, while a claim for false arrest does not, see Wallace v. Kato, 549 U.S. 384, 388-92 (2007).

**D.**

Jordan also challenges the district court's entry of summary judgment on the Maine tort claims for malicious prosecution and false imprisonment. For each of these claims, his brief to this court relies entirely on his arguments regarding the analogous constitutional claims of malicious prosecution and false arrest. Therefore, the malicious prosecution claim fails in view of Jordan's failure to satisfy the favorable termination element, as discussed above in subpart D. And the false imprisonment claim fails because Jordan provides no analysis as to how the Maine common-law tort would apply to the facts here, even assuming a false arrest. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). We therefore affirm the entry of summary judgment as to the state-law tort claims.

**E.**

Next, we address the defendants' argument that -- should we disagree with the district court's decision to enter summary judgment on all claims -- we should nevertheless affirm the entry of summary judgment for the federal claims against Santheson, Fuller, Labombarde, and the Town of Waldoboro on the alternative basis that they had too minimal a role in the conduct giving rise to Jordan's claims.

Jordan has alleged sufficient facts that a jury might reasonably find Chief of Police Labombarde liable on the Fourth Amendment claims. Recall that, according to Myers, Labombarde participated in the phone call in which Myers refuted the theory conveyed by the affidavit. In his affidavit in this litigation, Labombarde stated that he received regular updates about the status of the investigation and conceded that he reviewed the affidavit and the application for a search warrant before Hesseltine submitted them to the Maine district court judge. And Hesseltine stated, in his deposition, that Labombarde "was well aware of all the evidence that [Hesseltine] had" because Hesseltine "bounced everything off" Labombarde. These facts, taken together, convince us that -- should the jury find for Jordan -- it could reasonably find Labombarde partially responsible.

We agree, though, that Jordan has failed to allege facts upon which a jury could reasonably find Officers Fuller and Santheson culpable. Though Fuller interviewed Senior and Jordan, and heard Jordan offer to turn the firearms over for safekeeping, he had no role in applying for the search warrant, searching Jordan's home, or arresting Jordan. And though Jordan alleges that "Santheson was also an active participant in the investigation," he has marshalled no facts supporting an inference that Santheson had any material involvement aside from participating in the execution of the search warrant. Jordan

raises the specter of conspiracy and intervenor theories of liability, but he neither presents facts tending to show a conspiracy or intervenor liability nor develops any argumentation supporting these theories. These points are therefore waived. See Zannino, 895 F.2d at 17.

We also agree with the defendants that summary judgment is warranted for the claims against the Town of Waldoboro. "[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." City of Canton v. Harris, 489 U.S. 378, 385 (1989) (citing Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 694–95 (1978)). "Thus, a plaintiff must show that a policy or custom of the city led to the constitutional deprivation alleged." Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir. 1989). Jordan posits that the "unwritten policies, customs and/or practices of officers destroying notes of their investigations, not documenting witness interviews and exculpatory evidence in investigations, and not writing timely police reports was the cause" of the alleged constitutional deprivations. But Jordan's case theory is not that exculpatory information slipped through the cracks. Rather, he necessarily contends that officers recklessly or intentionally drew up a misleading affidavit in order to secure a warrant. We fail to see, on the record before us, how this misbehavior can be attributed to a custom or policy of the Town of Waldoboro. We

therefore affirm the entry of summary judgment for the claims against the municipality.

**F.**

Having concluded that a jury could find that Officer Hesseltine and Chief Labombarde violated Jordan's constitutional rights to be free from unreasonable search and seizure and false arrest, we turn to these two defendants' contention that we should affirm on the alternative grounds that they are entitled to qualified immunity. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Wesby, 138 S. Ct. at 589 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). We have already concluded that the officers violated a federal constitutional right, so the sole question is whether the unlawfulness of their conduct was "clearly established at the time." Id. at 589. "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [officer] that his conduct was unlawful in the situation he confronted." Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 9 (1st Cir. 2013) (emphasis omitted) (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).

As the defendants correctly conceded at oral argument, the law clearly prohibited officers from "us[ing] deliberately

falsified allegations to demonstrate probable cause." Franks, 438 U.S. at 168; see also Martínez-Rodríguez v. Guevara, 597 F.3d 414, 420 (1st Cir. 2010) ("It is . . . beyond peradventure that arrests procured on the basis of material false statements or testimony given in reckless disregard for the truth violate the Fourth Amendment."); Miller v. Prince George's Cty., 475 F.3d 621, 630 (4th Cir. 2007) ("[T]he Supreme Court has made . . . clear that police officers cannot intentionally lie in warrant affidavits, or recklessly include or exclude material information known to them."); Aponte Matos, 135 F.3d at 185 ("It has long been well established that . . . a material fabrication [in a warrant application] violates the Warrant Clause of the Fourth Amendment.").

Despite this concession, the defendants' brief could be read to argue that -- even assuming Hesseltine and Labombarde deliberately included falsehoods in the warrant affidavit -- they are entitled to qualified immunity unless Jordan can show that any reasonable officer would have understood that, absent the falsehoods, probable cause would not have existed. We must disagree. See Aponte Matos, 135 F.3d at 187 (1st Cir. 1998) (holding that "[a]n officer who obtains a warrant through material false statements which result in an unconstitutional search may be held personally liable for his actions under § 1983.")

- 33 -

The aim of the doctrine of qualified immunity "is to avoid the chilling effect of second-guessing where the officers, acting in the heat of events, made a defensible (albeit imperfect) judgment." Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010). There is no good reason to provide such protection to an officer who deliberately paints a misleading picture of the facts in order to procure a warrant. Whether or not it would have been clear to a reasonable officer that the false picture was necessary to establish probable cause, it certainly would be clear to any law enforcement officer that trying to mislead the judicial officer in seeking a warrant is highly improper. See Aponte Matos, 135 F.3d at 185 (noting that, because there was "no doubt that officers reasonably understand that they may not lie in order to establish probable cause in a warrant application," defendants would not be protected by qualified immunity if plaintiffs satisfied the Franks test).

Leon itself makes clear that among the "circumstances [in which an] officer will have no reasonable grounds for believing that the warrant was properly issued" is when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 922–23 (citing Franks, 438 U.S. at 171); see also Vigeant, 176 F.3d at 572 (observing that the Leon good-faith exception would

- 34 -

be difficult to invoke "where the shortcomings in probable cause were attributable to 'the inspectors' omissions in the warrant-application process.'" (quoting United States v. Ricciardelli, 998 F.2d 8, 16 (1st Cir. 1993))).

As the Seventh Circuit explained when confronting this question, "[q]ualified immunity depends on whether it would have been 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Rainsberger v. Benner, 913 F.3d 640, 652 (7th Cir. 2019) (emphasis omitted) (quoting Wesby, 138 S.Ct. at 590). An officer "d[oes] not face a choice about whether the facts in the hypothetical affidavit established probable cause," but rather "a choice about whether to make false or misleading statements in the affidavit." Id. And, needless to say, "a competent officer would not even entertain the question whether it was lawful for him to lie in a probable cause affidavit." Id.

The Seventh Circuit does distinguish between omissions and affirmative misstatements in warrant affidavits, holding that qualified immunity protects an officer who omitted material information from a warrant affidavit unless "it would have been clear to a reasonable officer that the omitted fact was material to the probable-cause determination." Id. at 654 (quoting Leaver v. Shortess, 844 F.3d 665, 669 (7th Cir. 2016)). The Seventh Circuit based its distinction between omissions and affirmative

misstatements on the need to protect "an officer acting in good faith [who] make[s] a reasonable mistake about his disclosure obligation." Id. But the question of qualified immunity arises only if we first presume a constitutional violation. And under Franks, such a violation in the case of an omitted fact requires, among other things, a finding that the omission was "'designed to mislead, or . . . made in reckless disregard of whether [it] would mislead, the magistrate' in his appraisal of the affidavit." Tanguay, 787 F.3d at 49 (alterations in original) (quoting Colkley, 899 F.2d at 301). So we are not so sure that there is any reason to treat omissions differently than misrepresentations in the qualified immunity analysis. In any event, on this record we consider the cumulative impact of what jurors might find to be a deliberate attempt to convey a knowingly false picture by combining a falsehood and two omissions in an effort to secure a warrant. So we are confident that the requirements for establishing a constitutional violation in this case provide sufficient protection for the officers so as to render any further qualified immunity analysis unnecessary.

We therefore decline to affirm the judgment on qualified immunity grounds.[7]

---

[7] Nothing in this opinion should be read as saying that either Hesseltine or Labombarde actually did anything improper. Rather, we hold only that if the facts are viewed favorably to Jordan, rational jurors could reasonably so conclude.

**G.**

Finally, we confront Jordan's argument that the district court erred in its conclusion that punitive damages are not available in this case. The sole basis of the district court's decision regarding punitive damages was "plaintiff's failure to generate triable issues as to his substantive federal and state-law claims." Jordan, 2018 WL 4688724, at *26. Since we have concluded that summary judgment was not appropriate on the constitutional false arrest and search and seizure claims, we vacate the district court's decision forbidding Jordan from seeking punitive damages. In so doing, we take no position on the availability of punitive damages.

**III.**

For the foregoing reasons, we affirm in part and reverse in part the entry of summary judgment against Chief of Police Labombarde and Officer Hesseltine. We affirm the entry of summary judgment against the other defendants, and we remand for proceedings consistent with this opinion. The parties shall bear their own costs.

**–Concurring Opinion Follows–**

**BARRON**, **Circuit Judge, concurring**.  Scott Jordan, Jr. brings a pair of claims under 42 U.S.C. § 1983 for damages that target the pretrial criminal detention that he allegedly endured in violation of the Fourth Amendment of the federal Constitution. He styles his first such § 1983 claim, which targets the pretrial detention that followed his initial warrantless arrest, as one for "false arrest."  He styles his second such § 1983 claim, which targets the pretrial detention that, it appears, followed a criminal complaint and summons, as one for "malicious prosecution."  Without assessing the relative strength of the underlying alleged Fourth Amendment violations, we hold that this "false arrest" § 1983 claim may proceed but that this "malicious prosecution" § 1983 claim may not.  The question that prompts this concurrence thus arises:  how can our different treatment of these two § 1983 claims be justified?

Our answer relies on Jordan's concession that a "favorable termination" requirement applies to this "malicious prosecution" § 1983 claim but not to this "false arrest" § 1983 claim.  Maj. Op. at 26.  Because the criminal proceedings ended upon the alleged victim's death before the criminal trial and not after, say, an acquittal, Jordan cannot satisfy that requirement. Id.  I thus join our opinion in full.

I write separately, however, to register my doubt that the "favorable termination" requirement applies to a § 1983 claim

that targets a pretrial criminal seizure simply because it is made pursuant to an arrest warrant, as some of the precedent that Jordan cites in support of his concession appears to indicate.[8]  Even an arrest pursuant to a warrant violates the Fourth Amendment if law enforcement secures it by tricking the magistrate into finding probable cause.  See Franks v. Delaware, 438 U.S. 154, 168-172 (1978).  I am thus not convinced that a plaintiff must show that any follow-on criminal proceedings ended in his favor when he seeks damages under § 1983 for a seizure pursuant to an arrest warrant. Or, at least, I am not convinced that a plaintiff should have to make that showing even when the challenged seizure occurs so early in the criminal case that it precedes a grand jury handing up an indictment or a prosecutor filing a criminal information.[9]  For, as our treatment of Jordan's "false arrest" § 1983 claim demonstrates, a plaintiff need not make that showing when he seeks damages for the harm caused by a similarly early-stage warrantless

---

[8] See Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (stating that a Fourth Amendment-based § 1983 "malicious prosecution" claim challenging a pre-indictment, warrant-based seizure is subject to a favorable termination requirement, seemingly no matter how early on in the case the warrant-based arrest occurs); cf. McDonough v. Smith, 139 S. Ct. 2149, 2156 (2019) (applying that requirement to a § 1983 malicious prosecution claim seeking damages, in part, for restraints on liberty resulting from pretrial detention).

[9] In referencing these types of charging events, here and throughout this concurrence, I do not mean to exclude any comparable ones that may be permitted in a particular state under that state's law.

seizure. See Manuel v. City of Joliet, 137 S. Ct. 911, 925-26 (2017) (Alito, J., dissenting) ("The Fourth Amendment . . . prohibits all unreasonable seizures -- regardless of whether a prosecution is ever brought or how a prosecution ends."); see also Pagán-González v. Moreno, 919 F.3d 582, 609 (1st Cir. 2019) (Barron, J., concurring) (describing the "favorable termination" requirement as applied to such a claim as an "anachronism").[10]

---

[10] I focus in this concurrence on whether, just because a seizure is made pursuant to an arrest warrant, the "favorable termination" requirement applies to a Fourth Amendment-based § 1983 claim for damages from that seizure. Jordan's "malicious prosecution" § 1983 claim does not, however, involve a seizure made pursuant to an arrest warrant. Rather, according to the stipulated facts, following his warrantless arrest on November 21, 2014, law enforcement personnel served Jordan with a Uniform Summons and Complaint that same day for a violation of Me. Stat. tit. 17-A, § 353.1A.2 by unauthorized taking/transfer. Law enforcement then transported Jordan to Two Bridges Jail, from which Jordan was released that same day on bail with conditions of release pursuant to a bail bond. It thus appears that this Fourth Amendment-based § 1983 claim -- unlike his Fourth Amendment-based "false arrest" § 1983 claim -- seeks damages for a period of detention that followed some legal process, in which that legal process took the form of the issuance of a mere criminal complaint and summons, which, under Maine law, may occur even without the involvement of a prosecutor and simply upon the action of a law enforcement officer. See Me. Stat. tit. 17-A, § 15-A. I do not address whether detention that follows that kind of relatively informal legal process -- unlike detention that follows legal process that takes the form of an indictment, a criminal information filed by a prosecutor, or some comparable charging event -- justifies subjecting a Fourth Amendment-based § 1983 claim to a "favorable termination" requirement to ensure that its pursuit will not interfere with any state criminal prosecution that may ensue. See infra. I also do not address whether the seizure that grounds this claim ended upon Jordan's release on bail or instead only upon the termination of certain bail conditions that restricted his liberty.

Jordan's "false arrest" § 1983 claim borrows its elements from the common-law tort of false arrest, which permits recovery for an unlawful seizure without legal process and which does not impose the "favorable termination" requirement. See Wallace v. Kato, 549 U.S. 384, 389 (2007) (describing the elements for such a § 1983 claim as: (1) causing "unlawful detention," i.e., detention without probable cause, and (2) "without legal process"). The accrual rule for this type of § 1983 claim is also borrowed from the claim for the common-law tort of false arrest, which accrues when the "alleged false imprisonment end[s]." Id. (internal quotation marks omitted). Because both the § 1983 and common-law types of "false arrest" claims target seizures that precede any criminal process, moreover, it makes sense that no "favorable termination" requirement applies. Neither the seizure's lawfulness nor the harm that it inflicts turns on how any follow-on criminal proceedings end.

There is, however, another type of Fourth Amendment-based § 1983 claim that also takes aim at a seizure that occurs early in a criminal case and thus before even, say, a grand jury has handed up an indictment or a prosecutor has filed a criminal information. See, e.g., Hernandez-Cuevas v. Taylor, 723 F.3d 91, 93-94 (1st Cir. 2013). But, this type of Fourth Amendment-based § 1983 claim targets a seizure that is made

pursuant to at least some legal process, as it targets a seizure that is made pursuant to an arrest warrant.  Thus, in accord with how plaintiffs often style such § 1983 claims, the common-law tort of malicious prosecution, which is subject to a "favorable termination" requirement, is often thought to supply the proper common-law analog for this type of § 1983 claim, as our precedent has also indicated.  See id. at 97-98.[11]  But, although this type of § 1983 claim, like the claim for the common-law tort of malicious prosecution, seeks recovery for a seizure pursuant to legal process, the two types of claims differ in important ways.

A claim for the common-law tort of malicious prosecution focuses on whether "criminal proceeding[s]" have been initiated or continued with malice and without probable cause.  Manuel, 137 S. Ct. at 925 (Alito, J., dissenting).  For that reason, "[a]lmost any kind of criminal proceeding" can ground such a claim, 3 Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 587 (2d ed. 2011), including not only a magistrate's issuance of an arrest warrant but also a grand jury indictment, a summons for the criminal defendant to appear at a hearing in his criminal case, a magistrate's determination in a criminal case at a probable-cause

---

[11] Insofar as the common-law abuse-of-process tort is a good analog, it appears not to have a "favorable termination" requirement.  See W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser and Keeton on The Law of Torts § 121 (5th ed. 1984).

hearing that the criminal defendant should be held, or the prosecutor's filing of a criminal information, Restatement (Second) of Torts § 654 & cmt. (c)-(e) (Am. Law Inst. 1977); W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser and Keeton on The Law of Torts § 119 (5th ed. 1984).

After all, the initiation of the criminal process -- and the stigma inherent in its initiation -- is the source of the injury for the common-law tort of malicious prosecution. Thus, such a claim for that tort "always involves defamation" while "detention or confinement is no part of the issue," 3 Dobbs, Hayden & Bublick, supra, § 586, and "any damages recoverable" must be based "on the wrongful use of judicial process rather than detention itself," Keeton, Dobbs, Keeton & Owen, supra, § 119.

The source of the injury for a Fourth Amendment-based § 1983 claim that seeks recompense for a seizure pursuant to legal process, however, is the detention itself, not the legal process used to effect it.[12] Thus, per Congress's instruction in 42 U.S.C. § 1988, we likely must look beyond the common-law tort of malicious prosecution to determine this type of § 1983 claim's requirements.

---

[12] I do not address the question of "whether injury from the issuance of a warrant without arrest" "may itself deprive a person of his liberty in violation of the Fourth Amendment." Ord v. District of Columbia, 587 F.3d 1136, 1146 (D.C. Cir. 2009).

- 43 -

See Carey v. Piphus, 435 U.S. 247, 258 n.13 (1978) (discussing 42 U.S.C. § 1988).

Manuel also supports our doing so. The plaintiff contended there that his pretrial detention violated the Fourth Amendment because the magistrate's finding of probable cause relied on evidence that law enforcement authorities had fabricated. See 137 S. Ct. at 915-16. Manuel permitted that Fourth Amendment-based § 1983 claim, even though the plaintiff had styled it as one for "malicious prosecution," to proceed, without referring to the § 1983 claim at issue as one for "malicious prosecution." Id. at 918, 921 (explaining that "pretrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process in a criminal case"). In fact, although Manuel explained that judges should "look first to the common law of torts" to identify the Fourth Amendment-based § 1983 claim's requirements, id. at 920, the Court also warned that judges should keep in mind that "[c]ommon-law principles are meant to guide rather than to control the definition of § 1983 claims, serving more as a source of inspired examples than of prefabricated components," id. at 921 (internal quotation marks omitted). Thus, the Court cautioned in Manuel, "[i]n applying, selecting among, or adjusting common-law approaches, courts must closely attend to the values and purposes of the constitutional right at issue." Id.

Manuel ultimately left open whether a "favorable termination" requirement applied to the claim there at issue, id. at 922, and, prior to Manuel, we did state that the "favorable termination" requirement applied to such a claim, see Hernandez-Cuevas, 723 F.3d at 99 n.8. But, Hernandez-Cuevas declined to borrow the requirements of the common-law tort of malicious prosecution wholesale in defining the requirements for that Fourth Amendment-based § 1983 claim, even though it involved a seizure made pursuant to an arrest warrant. Id. at 99-105 (discussing the omission of the common-law malice element from a Fourth Amendment-based challenge, per Franks, to a pre-indictment, warrant-based arrest and impliedly adjusting the probable-cause element). And, after Manuel, we suggested that the "favorable termination" might not apply to such a Fourth Amendment-based § 1983 claim, notwithstanding that it seeks recompense for a seizure made pursuant to legal process. See Pagán-González, 919 F.3d at 602; id. at 605-11 (Barron, J., concurring) (discussing the possible need for adjustment of the probable-cause and favorable-termination elements).

But, while all these signs point away from applying the "favorable termination" requirement to this type of Fourth Amendment-based § 1983 claim for damages from a seizure pursuant to an arrest warrant, there is one important sign that arguably does not. In McDonough, the Supreme Court recently held that the

"favorable termination" requirement did apply to the "malicious prosecution" § 1983 claim at issue there, even though the plaintiff sought damages, in part, for restraints on his liberty that he attributed to his pretrial seizure. 139 S. Ct. at 2156. Thus, I must address whether McDonough calls for a different analysis than the one that, in Pagán-González, I suggested would be proper.

I do not think that McDonough does. The Court described the § 1983 claim in that case as one that targeted "the integrity of criminal prosecutions undertaken 'pursuant to legal process'" rather than only the plaintiff's initial seizure pursuant to an arrest warrant. Id. (emphasis added) (citing Heck v. Humphrey, 512 U.S. 477, 484 (1994)). Nor did McDonough indicate that -- like the claims in Manuel and Pagán-González, and like the claim that Jordan brings -- the § 1983 claim there was based on the Fourth Amendment as opposed to, for example, the federal constitutional right to procedural due process. Moreover, while McDonough did identify practical reasons for applying a "favorable termination" requirement to the § 1983 claim before it, I am not convinced that these practical reasons apply equally to all purely Fourth Amendment-based § 1983 claims that seek damages for the harm caused by a warrant-based seizure.

McDonough invoked the need to prevent a "ticking limitations clock on criminal defendants as soon as they become aware that fabricated evidence has been used against them," given

"practical problems in jurisdictions where prosecutions regularly last nearly as long as -- or even longer than -- the relevant civil limitations period" and thus where "criminal defendants could face an untenable choice between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." Id. at 2158. But, that concern would not necessitate the imposition of a "favorable termination" requirement if such a Fourth Amendment-based § 1983 claim would not accrue until the assertedly unlawful detention terminates. Such termination could occur upon either the plaintiff's release from detention (including bail conditions) or the emergence of a separate legal basis for the detention -- whether that separate legal basis takes the form of a subsequent lawful arrest warrant, the handing up of an indictment by a grand jury, or a prosecutor's filing of a criminal information -- and thus would have nothing to do with the way that any follow-on criminal proceedings end.

McDonough also explained that the "favorable termination" requirement "avoid[s] parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." Id. at 2156–57. But, the Fourth Amendment's warrant requirement stems from concerns about trusting law enforcement to assess probable cause for itself. See Mincey v. Arizona, 437 U.S. 385, 394 (1978). Thus, a Fourth Amendment-based § 1983 claim for damages from a

- 47 -

warrant-based arrest -- at least when that seizure precedes a grand jury's indictment or a prosecutor's filing of a criminal information -- poses no greater inherent risk of interfering with follow-on state criminal proceedings than does a § 1983 claim that targets an equally early-stage warrantless arrest. Yet, "in accord with [the] common practice," a federal court that faces a § 1983 claim of that latter, warrantless-seizure-based sort may simply "stay the civil action until the criminal case or the likelihood of a criminal case is ended." Wallace, 549 U.S. at 393-94.

McDonough did also emphasize that "clear accrual rules are valuable." 139 S. Ct. at 2160. A termination requirement such as I have described, however, would not appear to be unduly hard to administer. That is especially so, given how uncertain even the "favorable termination" requirement itself can be.[13]

**II.**

The time that a criminal defendant may spend in pretrial detention after a warrant-based arrest but before a prosecutor files a criminal information or a grand jury hands up an indictment may be brief. But then, so too is the time that a criminal

---

[13] I note that, as long as the Franks violation is clear, it is not evident to me that, to overcome a qualified immunity defense, a plaintiff who brings a Fourth Amendment-based § 1983 claim of this sort needs also to demonstrate that it is clearly established that the claim is not subject to the "favorable termination" requirement. See Pagán-González, 919 F.3d at 616 (Barron, J., concurring).

defendant may spend in such early-stage detention after a warrantless arrest. The brevity of that detention has never been thought to justify conditioning a plaintiff's right to recover damages under § 1983 for that detention on his capacity to show that any criminal proceedings that may thereafter ensue ended in his favor. That is why we permit Jordan's "false arrest" § 1983 claim to proceed. But, for that very reason, I am not convinced that a plaintiff should have to make that "favorable termination" showing to obtain such recompense under § 1983 when he seeks damages for the harm caused by an equally early-stage unconstitutional seizure just because it is made pursuant to an arrest warrant. For, brief though the detention caused by that seizure may have been, there are few protections more basic than the right to be free from unjustified imprisonment, and thus there are few that are more in need of the kind of fulsome remedy that Congress supplied in § 1983 -- even if the common law itself does not supply one, too.